UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
                                      :

WHITE PLAINS HOUSING AUTHORITY,    :
                                        :

                     Plaintiff,       :       13-CV-6282 (NSR)
    -against-                     :
                                        :       OPINION & ORDER

GETTY PROPERTIES CORPORATION,     :
TYREE ENVIRONMENTAL CORPORATION,  :
SINGER REAL ESTATE GROUP, LLC,    :
MICHAEL C. KENNY and KENNETH C. SEUS,  :
                                        :

                   Defendants.     :
--------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge:

       Plaintiff White Plains Housing Authority ("Plaintiff") commenced this action by complaint filed September 6, 2013 (dkt. no. 1), as amended October 22, 2013 (dkt. no. 7) and January 21, 2014 (dkt. no. 26), against Getty Properties Corporation ("Getty Properties"), Tyree Environmental Corporation ("Tyree"), Michael C. Kenny, and Kenneth C. Seus (collectively, the "Getty Defendants"), and against Singer Real Estate Group LLC (incorrectly named as "Singer Real Estate Group, LLC") ("Singer," and together with the Getty Defendants, "Defendants").

       The complaint asserts claims under: the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., for both cost recovery and declaratory relief; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq.; the New York State Navigation Law § 181(1); and New York state law regarding private nuisance, trespass, strict liability, and negligence. These claims stem from purported gasoline discharge into the environment from a former gasoline filling station located in White Plains, New York. The operative complaint asserts each claim against each of the Defendants,

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/16/2014

with the exception that the RCRA claim is not asserted against Singer.

Defendants now move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted, and 12(b)(1), for lack of supplemental jurisdiction over the state law claims.  The two pending motions to dismiss (dkt. nos. 34, 36) are consolidated for purposes of this opinion and order.  For the following reasons, the Court GRANTS the motions in part, and DENIES the motions in part.

### I.  FACTS

#### A.  Plaintiff's Motion to Strike

As a threshold matter, Plaintiff challenges the Getty Defendants' submission of an affidavit and voluminous exhibits.  *See* Affidavit of Paul Hatcher (the "Hatcher Affidavit") (dkt. no. 41).  The materials submitted with the Hatcher Affidavit, and the facts in the affidavit, pertain primarily to the RCRA claim.  The Getty Defendants seek to establish that substantial dialogue and diligence have occurred as between Getty Properties and Tyree, on one hand, and the New York State Department of Environmental Conservation (the "DEC"), on the other.  The Getty Defendants argue that well-documented past and ongoing remediation of the environmental contamination at issue undercuts the RCRA claim.

The Getty Defendants argue that the Court should take judicial notice of the information in the Hatcher Affidavit and the exhibits, analogizing these materials to an administrative agency "consent decree mandating investigation and remediation of [sic] hazardous waste site."  Getty Mem. at 3 n. 1 (citing *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 602 (D. Md. 2011)).  In the alternative, they argue, "under Rule 12(d), the Court

can consider matters outsite [sic] the pleadings on a Rule 12(b)(6) motion." *Id.*[1]

In response, Plaintiff points out that there is no agency consent decree among the materials submitted. Plaintiff argues that the Hatcher Affidavit is objectionable and should be disregarded. *See* Plaintiff's Mem. at 8-9.

Plaintiff is correct that "[i]n adjudicating a motion to dismiss, a court may consider only the complaint, a written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *Geron v. Seyfarth Shaw LLP (In re Thelen LLP)*, 736 F.3d 213, 219 (2d Cir. 2013). Equally true, "matters judicially noticed by the District Court are not considered matters outside the pleadings." *Id.* (citing *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 426 (2d Cir. 2008)).

Courts in this circuit routinely take judicial notice of complaints and other publicly filed documents. *See, e.g.*, *Rothstein v. Balboa Ins. Co.*, No. 14-cv-1112, 2014 U.S. App. LEXIS 16567, at *1-2 (2d Cir. June 25, 2014) (taking judicial notice of other complaints filed with federal courts); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of other complaint "as a public record"). Courts also take judicial notice of information readily accessible in the public domain, the significance of which is not subject to reasonable dispute. *See, e.g.*, *Staehr*, 547 F.3d at 426 (taking judicial notice of information in the public domain, albeit not for its truth, in assessing whether there was inquiry notice of alleged fraud); *accord* Fed. R. of Evid. 201 (court may judicially notice a fact not subject to reasonable dispute because

---

[1] Federal Rule of Civil Procedure 12(d) provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."

it is generally known within the jurisdiction or is supported by sources beyond question).

Here, the Getty Defendants would have the Court go quite a bit further. Appended to the Hatcher Affidavit are voluminous materials, including remediation reports, studies, work plans, and letter and email correspondence among the relevant parties. The Getty Defendants represent that these materials are part of the DEC file and are accessible through a Freedom of Information Law request. *See* Getty Mem. at 3 n.1.

That may be true, but the materials' presence in the DEC file does not necessarily compel judicial notice. *See Rothstein*, 2014 U.S. App. LEXIS, at *1-2 (denying motion seeking judicial notice of certain documents made public by state agency under New York's Freedom of Information Law, while granting the motion as to complaints filed in other federal courts). The materials submitted are not formal, filed pleadings or routine regulatory filings. They are, rather, an assortment of discovery materials reflecting environmental remediation efforts and related correspondence with a state agency. Some of the documents are informal emails. Others are letters or reports. The parties differ in their characterization of the information reflected in these documents, as it relates to the question of whether there has been diligent remediation of environmental contamination.

The Court finds that these materials are not appropriate for judicial notice on a Rule 12(b)(6) motion where the analysis turns primarily on what is between the four corners of the complaint. *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor). The information in the Hatcher Affidavit and its significance are the subject of much dispute, and the information is not generally known or supported by sources beyond question.

4

Perhaps expecting such a ruling, the Getty Defendants argue that nevertheless "the facts matter and should be considered," and they urge the Court to convert the motion to a motion for summary judgment. *See* Getty Reply Mem. at 5-7. The Court declines to do so here. Although the Court permitted the Getty Defendants orally to join in Singer's motion for leave to file a dispositive motion (and to file the dispositive motion), Singer had sought leave to file a motion to dismiss pursuant to Rule 12(b)(6). *See* dkt. nos. 4, 24. Having reviewed pre-motion letters and the colloquy at the pre-motion hearing, the Court disagrees with the Getty Defendants' characterization that there was adequate notice that the motion to dismiss might be converted to a motion for summary judgment. When counsel for Singer sought clarification at the pre-motion hearing, the Court differentiated between a motion to dismiss and a summary judgment motion and indicated that the former was expected. Additionally, the mere fact that Plaintiff enclosed a remediation report with its opposition brief does not mean Plaintiff had adequate notice of possible conversion. Plaintiff presumably bolstered its submission with this report as a way to respond to the Getty Defendants' voluminous filing, and Plaintiff formally objected to the Hatcher Affidavit by letter before filing any opposition briefing. *See* dkt. no. 33.

The Court denies the Getty Defendants' application to convert their motion to a motion for summary judgment. The Court strikes the Hatcher Affidavit and all materials appended thereto because they are inappropriate for consideration under Rule 12(b)(6). The Court has not considered or relied upon those materials in issuing this decision. Likewise, the Court strikes and has not considered or relied upon the remediation report accompanying the Declaration of Norman W. Bernstein, submitted with opposition briefing, notwithstanding references to that report in the complaint. *See* dkt. no. 40. The Court also strikes and has not considered or relied upon the document accompanying the Reply Affidavit of Paul Hatcher, submitted with reply

5

briefing.  *See* dkt. no. 46.

Should this matter reach the summary judgment stage, the parties (and specifically, the Getty Defendants) are directed to follow the Court's individual rules of practice in civil cases. Those rules require that the Getty Defendants submit a pre-motion letter seeking leave to file a dispositive motion.  *See* Individual Practice Rule 3(A)(ii).  That pre-motion practice tends to narrow the issues and clarify the nature of the relief sought, and should eliminate any further confusion on the Getty Defendants' part as to what motion is anticipated.  Provided the Court ultimately grants leave to file a summary judgment motion in this case, the Getty Defendants are, of course, free to resubmit the Hatcher Affidavit then.

## B.  Complaint

### 1.  Background

The complaint alleges that Plaintiff is a municipal housing authority that owns and operates a five apartment building, residential housing complex known as Winbrook apartments, in downtown White Plains, New York.  *See* Second Amended Complaint ("Compl.") ¶¶ 7, 9. One of the five buildings is "Building 159," which is located at 159 South Lexington Avenue. *Id.* ¶ 10.

Getty Properties operated a retail gasoline filling station, Getty Station No. 00369, at 26 East Post Road, White Plains, New York ("Getty Station"), which is adjacent to Plaintiff's building complex.  *Id.* ¶ 13.  Getty Station was in use from approximately 1973 to 1988.  *Id.* ¶ 14.  Gasoline was stored at Getty Station during that time.  *Id.* ¶ 114.

Gasoline is a "fraction" of petroleum and crude oil, i.e., its properties are indigenous to petroleum and crude oil and are created through the distillation and refining process.  *See id.* ¶¶ 110-11, 113.  Benzene is another indigenous subcomponent of petroleum, and of gasoline, but no

6

pure Benzene was stored at Getty Station, only gasoline containing benzene and other constituent chemicals. *See id.* ¶ 112.

### 2. Gasoline Discharge and Residual Contamination

Plaintiff alleges that at some point while Getty Properties owned and operated Getty Station, gasoline was released into the environment. *Id.* ¶ 114. Once in the ground under Getty Station, that gasoline (chemically, a "mixture") separated into its constituent parts, one of which was benzene. *Id.* ¶¶ 114-15. Benzene is toxic and water soluble, and it does not tend to adhere to soil. *Id.* The benzene from the gasoline discharge therefore traveled more quickly through surrounding groundwater than did other constituent parts of the gasoline. *Id.* Eventually, the benzene, and to a lesser extent, other volatile organic compounds (ethyl-benzene and toluene), migrated away from Getty Station to the space underneath a parking lot adjacent to Plaintiff's Building 159. *Id.* ¶¶ 33, 52-52, 119. The parking lot is Plaintiff's property as well. *Id.*

As noted, Building 159 is residential in nature. There are underground conduits such as ducts and pipes which enter the building. *Id.* ¶ 58. Presently, there is a "groundwater plume" of benzene and other chemicals contaminating Plaintiff's property and continuing to migrate toward Building 159. *Id.* ¶ 78.

Because of its toxicity, the benzene in the plume "may present an imminent and substantial endangerment to human health and the environment." *Id.* ¶ 83. Additionally, Plaintiff has begun a $350 million renovation project, which would make the five building complex energy efficient. *Id.* ¶ 84. Plaintiff broke ground on that project on January 15, 2014. *Id.* ¶ 85. The plume may prevent or interfere with financing for the project, at least some of which is contingent public financing, because federal and state regulations prohibit the development of contaminated properties. *Id.* ¶¶ 92-94.

7

### 3.  Property Ownership

Getty Station is no longer an operating gas station, and ownership of the underlying property has changed hands over the years.  Individual defendant Kenny purchased the property in 1994 and held it until 2011.  *Id.* ¶¶ 24, 27-28.  From 2005 to 2011, Kenny held the property as co-owner with individual defendant Seus.  *Id.*  From 1994 through 2011, additional "hazardous wastes" (presumably, additional gasoline or residue thereof) were released into the environment from Getty Station, and gasoline constituents continued to migrate onto Plaintiff's property.  *See id.* ¶¶ 24, 27.  In February 2011, Singer purchased the property.  *Id.* ¶ 43.  Singer did so knowing the property was contaminated.  *Id.*

### 4.  Remediation

The complaint alleges that several steps toward remediation have taken place, but that they have been ineffective.  The contamination was reported to the DEC in or about February 1998, presumably triggering DEC oversight of remediation efforts thereafter.  *See id.* ¶ 38.  In 2000, Getty Properties—still involved, apparently, despite the property sale to Kenny—obtained consent from Plaintiff to conduct periodic monitoring in the parking lot adjacent to Building 159.  *Id.* ¶ 37.  In 2001, Getty Properties retained environmental consultant Tyree to help remediate the contamination.  *Id.* ¶ 35.

From August 2001 to April 2007, Tyree operated a dual phase high vacuum extraction system at the property.  *Id.* ¶ 39.  Then, in April 2007, Tyree substituted a vapor/fluid recovery program in place of the vacuum extraction system.  *Id.* ¶ 40.  Plaintiff contends that the new recovery program was ineffective, and largely a cost-saving measure approved by Getty Properties.  *See id.* ¶¶ 41-42.  Tyree terminated the recovery program in 2009.  *Id.* ¶ 41.

In late 2011, Tyree contacted Plaintiff to obtain consent to test a chemical process known

8

as ozone injection in Plaintiff's parking lot, a process which may generate fumes that could enter Building 159 through ducts or pipes. *Id.* ¶¶ 45, 57. The DEC apparently had approved the ozone injection. *Id.* ¶ 59.

In May 2012, Tyree provided Plaintiff a September 2011 monitoring report summarizing Tyree's remediation activities to date. *Id.* ¶ 46. The report indicated a benzene level on Plaintiff's property far in excess of DEC acceptable water quality standards for potable water. *See id.* ¶¶ 50-51. The report also did not fully illustrate the proximity of the contamination to Building 159. *Id.* ¶ 60. Partly because of that proximity, Plaintiff objected to the DEC-approved ozone injection. *Id.* Plaintiff requested that Tyree delineate the entire contamination plume and document its proximity to Building 159. *Id.* ¶ 61. In response, in March 2013, Tyree submitted to the DEC a revised work plan that (i) called for additional testing of the plume's encroachment onto Plaintiff's property, (ii) did not involve ozone injection, and (iii) showed the location of Building 159. *Id.* ¶ 62.

Also in March 2013, a conference call was held among Plaintiff, the DEC, and relevant parties, consultants, and counsel. *Id.* ¶ 63. Following that call, it appeared that all differences of opinion concerning remediation had been resolved. *Id.* Thereafter, however, Getty Properties did not cause Tyree to implement the work plan until October 2013, after clearing up some confusion and confirming the DEC's approval. *See id.* ¶¶ 64-65. Then, in November 2013, Tyree filed a report with the DEC showing the results of soil and groundwater samples taken from Plaintiff's property. *Id.* ¶ 68. The November 2013 report did not map the location of the plume and characterized the contamination as "petroleum impacted" (Plaintiff describes it as "individual chemical constituents"). *Id.* ¶ 69. The report allegedly had numerous other deficiencies too, for example, it did not model the plume's trajectory and did not address

concerns regarding vapor intrusion of Building 159. *Id.* ¶ 70. On December 30, 2013, a consultant Plaintiff had retained, First Environment, provided a report and critique of the Tyree report, which showed continued migration of the plume toward (and possibly, underneath) Building 159. *Id.* ¶¶ 73-74. Subsequent groundwater testing confirmed that there are atypically high concentrations of benzene within ten feet of Building 159, including near a water line entering the building. *Id.* ¶¶ 75-76.

## II.  MOTION TO DISMISS STANDARD

On a motion to dismiss for failure to state a claim upon which relief can be granted, Rule 12(b)(6) dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). "Although for the purposes of a motion to dismiss [a court] must take all of the factual allegations in the complaint as true, [it is] 'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

When there are well-pleaded factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* A claim is facially plausible when the factual content pleaded allows a court "to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Ultimately, determining whether a complaint states a facially plausible claim upon which relief may be granted must be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### III. DISCUSSION

#### A.  CERCLA

Plaintiff asserts a cost recovery claim against all Defendants under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), seeking to recover costs incurred responding to the environmental contamination on Plaintiff's property.  As a derivative of the cost recovery claim, Plaintiff asserts a second claim under 28 U.S.C. § 2201 and 42 U.S.C. § 9613(g)(2), seeking declaratory relief, namely, an order declaring that Defendants are jointly and severally liable for necessary costs of future investigation and clean-up.

Section 107(a) of CERCLA permits a citizen suit against qualifying defendants, to recover the "necessary costs of response" incurred "consistent with the national contingency plan" (the "NCP"), plus interest.  42 U.S.C. § 9607(a)(1)-(4)(B).  A viable private action requires (i) a release or threatened release, (ii) from a facility, (iii) of a hazardous substance, (iv) which causes "necessary costs of response."  *Id.*  Defendants do not dispute that they qualify as potentially liable parties under Section 107(a).  Rather, the dispute at this stage of the case centers on the term "hazardous substance."  Plaintiff's CERCLA claims posit that Getty Station released benzene, a hazardous substance, into the environment.  Defendants argue that the case concerns a release of gasoline, of which benzene was but one constituent part.

CERCLA defines "hazardous substance" as any substance designated within certain enumerated statutes which list a variety of toxic chemicals.  42 U.S.C. § 9601(14).  But the definition also contains a carve-out:

> The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph . . . .

11

*Id.* This carve-out is known as the "petroleum exclusion," and because gasoline is a fraction of petroleum, the exclusion bars a CERCLA claim for gasoline spills. *See Wilshire Westwood Associates v. Atlantic Richfield Corp.*, 881 F.2d 801, 801 (9th Cir. 1989). On the other hand, "subparagraphs (A) through (F)," mentioned in the petroleum exclusion, enumerate statutes which specifically name benzene as a hazardous substance, and it is undisputed that benzene also is indigenous to petroleum. *See* Compl. ¶ 112. Thus, the clause beginning, "which is not otherwise specifically listed or designated," carves benzene out of the petroleum exclusion. Consequently, a release of benzene, standing alone, may support a CERCLA claim. That is not in dispute. *See* Singer Mem. at 6.

Instead, the instant motions present the question of whether benzene that was once part of a gasoline mixture discharged into the environment, but which thereafter separated from other constituent parts of the gasoline, may support a CERCLA claim. *See* Compl. ¶¶ 114-15. Recognizing that gasoline discharge is non-actionable, whereas benzene discharge is actionable, Plaintiff seeks to frame the contamination as a "plume" of the hazardous substance benzene, which has been, and is continuing to be, "released" within the meaning of CERCLA. *Id.* ¶¶ 31, 32, 130.

In response, Singer argues that Plaintiff has alleged only a release of gasoline from Getty Station, and not any release of benzene. Singer Mem. at 6. Singer contends that any post-release breakdown of the gasoline into constituent parts including benzene does not bring the action within CERCLA's purview. *See id.* at 6-7. Similarly, the Getty Defendants argue that "petroleum constituent parts, including benzene, are within the purview of the statutory exclusion" for petroleum products. Getty Mem. at 6.

Rebutting Singer's argument, Plaintiff contends that "continuing migration" of

contaminants from Getty Station is a continuing "release."  *See* Plaintiff's Mem. at 16-17 (citing *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1042-45 (2d Cir. 1985) ("[T]he leaking tanks and pipelines, the continuing leaching and seepage from the earlier spills, and the leaking drums all constitute 'releases.'")).  Plaintiff further argues that the petroleum exclusion does not apply where, once in the ground, gasoline separates "into its by-products or constituents due to physical, chemical, and biological actions," and where one of those by-products or constituents is benzene.  Plaintiff's Mem. at 19 (quoting Compl. ¶¶ 114-15).  Plaintiff argues that "Congress did not provide an exclusion for the by-products of gasoline after it degrades in groundwater."  Plaintiff's Mem. at 19.  Plaintiff argues that there would have been no reason to carve enumerated hazardous substances out of the petroleum exclusion had Congress wished to make the release of "all petroleum or anything derived from it" non-actionable.  *Id.*  And Plaintiff argues that a separate exclusion insulating service station providers who transport or dispose of recycled oil, 42 U.S.C. § 9614(c)(1), is redundant if the petroleum exclusion is read so expansively.  *Id.*

There is no Second Circuit authority on all fours with the instant case.  Rather, the principal appellate guidance is *Wilshire Westwood Associates v. Atlantic Richfield Corp.*, from the Ninth Circuit.  881 F.2d 801 (9th Cir. 1989).  The *Wilshire Westwood* court addressed the argument that the hazardous substances carve-out from the petroleum exclusion renders the exclusion inapplicable to all releases of petroleum products containing those hazardous substances.  *Id.* at 804.  The court disagreed with the plaintiff in that case, noting that such a construction would render the petroleum exclusion a nullity since hazardous substances are indigenous to petroleum and crude oil, and thus are always present as a constituent part.  *Id.*  The court also declined to draw a distinction between substances added to a petroleum product and

those indigenous to the product, where all of the alleged additives were also indigenous.  *Id.* at 805.  Ultimately, noting an absence of compelling legislative history, and according Environmental Protection Agency ("EPA") guidance due deference, the court concluded that "the petroleum exclusion in CERCLA does apply to unrefined and refined gasoline even though certain of its indigenous components and certain additives during the refining process have themselves been designated as hazardous substances within the meaning of CERCLA."  *Id.* at 810.

Shortly after the *Wilshire Westwood* holding, this Court referenced that holding in a case concerning the extent to which waste oil emulsion—petroleum fraction to which contaminants have been added during use—falls within the petroleum exclusion.  *City of New York v. Exxon Corp.*, 766 F. Supp. 177, 186 (S.D.N.Y. 1991).  Consistent with the reasoning in *Wilshire Westwood* and with EPA guidance, the Court found that where levels of contaminants in the oil *increase* during the industrial process, the waste oil emulsion falls within CERCLA's definition of hazardous substances, rather than within the petroleum exclusion.  *Id.* at 187.  The Court therefore held that CERCLA liability attaches to the extent that contaminant levels in the waste emulsion exceed the levels in the unused petroleum product.  *Id.*  By implication, however, indigenous contaminants which do not increase in concentration during the industrial process do not support a CERCLA claim.  *See id.*

Still more recently, our sister court in the Northern District of New York addressed the petroleum exclusion and likewise tracked the reasoning in *Wilshire Westwood*.  In *Wademan v. Concra*, after finding that a CERCLA claim failed for lack of standing, the court stated in dicta that the complaint failed to state a CERCLA claim in light of the petroleum exclusion, where the complaint alleged that "benzene, a derivative of petroleum," was the source of the plaintiff's

14

injuries.  13 F. Supp. 2d 295, 302 (N.D.N.Y. 1998).  In *City of New York v. Almy Bros. Inc.*, the court again found no CERCLA liability, for the release of sludge from tanks that stored diesel fuel and other petroleum-related products, where there was no evidence that hazardous substances were added to the products or that the substances increased in concentration during product use.  No. 90-cv-818, 1998 U.S. Dist. LEXIS 11769, at *26-27 (N.D.N.Y. July 31, 1998).

While none of these authorities are controlling, this Court sees no reason to deviate from their reasoning.  Applying that reasoning to this case, first, the mere presence of benzene in the gasoline originally released from Getty Station does not forestall the operation of the petroleum exclusion.  *Wilshire Westwood*, 881 F.2d at 810.  Plaintiff concedes this.  Plaintiff's Mem. at 20. Second, the benzene now present in the groundwater is a "derivative" of a petroleum product, gasoline.  *Wademan*, 13 F. Supp. 2d 302.  Plaintiff effectively concedes this as well.  *See* Compl. ¶ 113 (gasoline was released), ¶ 114 (the gasoline separated into its by-products through chemical processes).  Third, the benzene was wholly indigenous to the gasoline, not additive, and its concentration did not increase during storage or industrial use.  *Almy Bros.*, 1998 U.S. Dist. LEXIS 11769, at *26-27.  The complaint does not allege otherwise.

Nevertheless, Plaintiff argues that the continuing migration of a constituent part of gasoline, the benzene, supports CERCLA liability, even though the original discharge was gasoline in its whole, unseparated form.  *See* Compl. ¶¶ 114, 130.  Although novel, the Court finds that argument to be unsupported and in tension with the precedents and reasoning discussed above.

The Second Circuit's holding in *New York v. Shore Realty Corp.*, which characterized "leaching and seeping from earlier spills" as individual "releases," does not support Plaintiff's position.  759 F.2d 1032, 1044-45 (2d Cir. 1985).  That case involved several discharges from

15

tanks and drums that occurred over a period of years, but notably, the tanks and drums contained stand-alone quantities of benzene and other toxic chemicals. *Id.* at 1038. In finding that persistent chemical leaching and seeping were actionable, the Second Circuit held only that continuing leaks from the original storage facility into groundwater and a nearby bay were additional releases. *See id.* at 1038-39, 1045 (e.g., "seepage from the bulkhead . . . leakage from some of the tanks"). The Court did not address facts like those in the instant case—involving gasoline's breakdown to a more elemental form—because the original materials leaked in *Shore Realty* were not petroleum or gasoline mixtures, but rather, were undisputedly hazardous substances. *Shore Realty* is therefore inapposite and sheds little light on the arguments made here.

It should also be noted that EPA opinions are in tension with Plaintiff's position, if not wholly contrary to it.[2] And the EPA's interpretation of the petroleum exclusion is entitled to substantial deference. *Chevron, USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-45 (1984) (court may not substitute its own construction for a reasonable agency interpretation).

Further, Plaintiff has cited no authority supporting the proposition that degradation of gasoline re-releases hazardous substances contained therein. This argument, rather, is in tension with the basic factual premise of this dispute. In the pleadings, Plaintiff concedes that no benzene in its pure form was stored at Getty Station. Compl. ¶ 112. Plaintiff also concedes that the only fraction of petroleum or crude oil stored and released from Getty Station was gasoline.

---

[2] *See* Memorandum from Francis Blake, General Counsel, EPA, regarding Scope of the CERCLA Petroleum Exclusion under Sections 101(14) and 104(a)(2) (July 31, 1987), at 5 (petroleum includes "crude oil and fractions of crude oil, including the hazardous substances, such as benzene, which are indigenous in those petroleum substances").

*Id.* ¶ 113.  This was, after all, a gasoline filling station.  Although the complaint does not elaborate on the circumstances of the original gasoline discharge, the case plainly centers on the release of gasoline into groundwater and the residual effects of that release.

It may well be that constituent parts of the gasoline have since dispersed and that benzene did so more quickly than other chemicals.  Plaintiff contends a benzene "plume" now threatens to impact its property.  But that dispersion, a secondary effect of the initial gasoline release, does not alter the nature of the release.  If it did, that would frustrate the purpose of the petroleum exclusion, since plaintiffs could simply wait until a spilled petroleum product breaks down into elemental form, and then sue.  Query when along the spectrum of chemical degradation such a claim would accrue for statute of limitations purposes.

Ultimately, the Court agrees with Defendants that on the face of the complaint, no release of benzene, as opposed to gasoline, is alleged.  Plaintiff therefore cannot avoid the petroleum exclusion.  That exclusion bars the cost recovery claim.  The declaratory relief claim fails in turn. Those two claims are dismissed.

### B.  RCRA

Plaintiff asserts the RCRA claim against the Getty Defendants only.  Section 6972(a) of the RCRA provides a private right of action, much like CERCLA does:

> [A]ny person may commence a civil action on his behalf . . . against any person . . . including any past or present generator . . . or past or present owner or operator of a treatment . . . facility, who has contributed or who is contributing to the past or present handling, storage, treatment . . . or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . . .

42 U.S.C. §  6972(a)(1)(B).  "The language of this section of the RCRA is expansive, and is 'intended to confer upon the courts the authority to grant affirmative equitable relief to the extent

17

necessary to eliminate any risk posed by toxic wastes.'" *Kara Holding Corp. v. Getty Petroleum Mktg., Inc.*, 67 F. Supp. 2d 302, 310 (S.D.N.Y. 1999) (quoting *United States v. Price*, 688 F.2d 204, 214 (3d Cir. 1982)).

There is no petroleum exclusion in the RCRA. There are, however, certain other carve-outs:

> No action may be commenced . . . if the State . . . (i) has commenced and is diligently prosecuting an action under subsection (a)(1)(B) of this section; (ii) is actually engaging in a removal action under section 104 of [CERCLA]; or (iii) has incurred costs to initiate a Remedial Investigation and Feasibility Study under [CERCLA] and is diligently proceeding with a remedial action under that Act . . . .

42 U.S.C. § 6972(b)(2)(C). The Getty Defendants seek dismissal of the RCRA claim pursuant to these carve-outs, arguing that the DEC is "actually engaging in a removal action" and that the DEC "has incurred costs to initiate a study . . . and is diligently proceeding." *See* Getty Mem. at 10-11. The Getty Defendants concede that the DEC has not commenced any court action, and they further concede the absence of an action or costs incurred *under CERCLA. Id.* at 11. Even so, they argue that diligent DEC oversight of ongoing remediation bars recovery under the RCRA. To demonstrate the required diligence, they rely on the Hatcher Affidavit almost exclusively.

The Court has stricken the Hatcher Affidavit and thus the affidavit and enclosed materials do not compel dismissal of the RCRA claim. Further, even assuming *arguendo* that the Getty Defendants' submission demonstrates DEC diligence, their argument fails because they concede the absence of an outright DEC lawsuit, while describing only state administrative enforcement. "[S]tate administrative actions simply do not constitute 'actions,'" as contemplated in Subsection 6972(b)(2)(C)(i) of the RCRA. *Kara Holding Corp.*, 67 F. Supp. 2d at 307 (collecting

18

authorities); *see also Orange Env't, Inc. v. Cnty. Of Orange*, 860 F. Supp. 1003, 1024 (S.D.N.Y. 1994) ("[W]e hold that subsection (b)(2)(C)(i) only prohibits (a)(1)(B) claims where a state has brought an action in court."). Thus, the first carve-out—for diligent prosecution of an action under the RCRA—does not preclude an RCRA claim. *Kara Holding Corp.*, 67 F. Supp. 2d at 307. The cases the Getty Defendants cite do not disturb this conclusion; most involved outright EPA lawsuits, i.e., "actions," and several of the cases are inapposite because they arose under different statutes entirely.

Likewise, the argument that RCRA subsections (b)(2)(C)(ii) or (iii) precludes the claim fails because the Getty Defendants conflate DEC state enforcement with a removal action and costs incurred *under CERCLA*. The exclusions at (ii) and (iii) plainly require the latter, CERCLA-specific enforcement. *Orange Env't, Inc.*, 860 F. Supp. At 1026. At the least, there must be federal authorization to carry out a removal action pursuant to a settlement agreement or a joint federal-state cooperative enforcement agreement, *id. at* 1026, 1028,[3] and no such agreement is alleged or judicially noticeable here. Rather, taking the complaint at face value, the DEC received reports, provided oversight, and approved work plans for remediation efforts (*see* Compl. ¶¶ 38, 59, 62-63), but the agency did so without federal cooperation and without taking any action under CERCLA. The Getty Defendants therefore cannot capitalize on the latter two carve-outs from the RCRA either. Their motion to dismiss the RCRA claim is denied.

## C. SUPPLEMENTAL JURISDICTION

Next, all Defendants move to dismiss the state law claims pursuant to Rule 12(b)(1), for

---

[3] *See also Solvent Chem. Co. ICC Indus., Inc. v. E.I. Dupont De Nemours & Co.*, 242 F. Supp. 2d 196, 219 (W.D.N.Y. 2002) ("Plaintiffs, not the State, are remediating the 3163 Buffalo Avenue Site and Olin Hot Spot, and their remedial efforts have been conducted under the State's Environmental Conservation Law, not CERCLA . . . . Thus, the exception under RCRA Section 7002(b)(2)(C)(iii) does not apply.").

19

lack of subject matter jurisdiction, thereby requesting that the Court decline to exercise

supplemental jurisdiction over those claims. "In any civil action of which the district courts have

original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims

that are so related to claims in the action within such original jurisdiction that they form part of

the same case or controversy under Article III of the United States Constitution." 28 U.S.C. §

1367(a). "The district court may decline to exercise supplemental jurisdiction over a claim under

subsection (a) if the district court has dismissed all claims over which it has original

jurisdiction." *Id.* § 1367(c)(3). "In the usual case in which all federal-law claims are eliminated

before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—

judicial economy, convenience, fairness, and comity—will point toward declining to exercise

jurisdiction over the remaining state-law claims." *Dilaura v. Power Auth. of N.Y.*, 982 F.2d 73,

80 (2d Cir. 1992).

  In light of the above rulings, dismissal of the state law claims pursuant to Rule 12(b)(1) is

not warranted. The Court has dismissed the CERCLA claim asserted against all Defendants, but

has sustained the RCRA claim asserted against the Getty Defendants. Because a federal claim

remains against at least one defendant, judicial economy will not be served by dismissing state

law claims which arise from substantially the same "common nucleus of operative fact." *United

Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). There is no federal claim remaining against

Singer, and thus arguably Singer should be free to litigate in state, rather than federal, court. But

that would not accomplish judicial economy since it would create duplicative actions. Parallel

federal and state litigation likely would inconvenience both courts and at least one of the parties,

Plaintiff. It also could jeopardize principles of fairness and comity, given the risk of inconsistent

decisions by the two courts on substantially identical state law claims. The balance of factors

under the pendent jurisdiction doctrine therefore compel retention of the state law claims against

both the Getty Defendants and Singer.  The motions to dismiss those claims for lack of subject

matter jurisdiction are denied.

### D.  STATE LAW CLAIMS[4]

Finally, Singer moves to dismiss each of the five state law claims against it pursuant to

Rule 12(b)(6).  The Court will address each claim in turn.

#### 1.  New York Navigation Law

The New York Navigation Law (a/k/a the "Oil Spill Act") imposes statutory strict

liability on parties "who ha[ve] discharged petroleum."  N.Y. Nav. Law § 181(1).  A viable

Section 181(1) claim requires that:  (i) Defendants are "dischargers"; (ii) a discharge of

petroleum occurred; and (3) the discharge contaminated Plaintiff's property.  *Lambrinos v.*

*Exxon Mobil Corp.*, No. 00-cv-1734, 2004 U.S. Dist. LEXIS 19598, at *19 (N.D.N.Y. Sept. 29,

2004) (summarizing New York state authorities).

Singer first argues that the Navigation Law claim should be dismissed because Plaintiff

has not alleged that Singer controlled the property or events leading to the original gasoline spill,

in other words, that Singer was a discharger.  Singer Mem. at 12-13.  That argument fails

because the New York Court of Appeals has sustained a Section 181(1) claim against a property

owner that purchased a gasoline service station with knowledge of a previous petroleum spill and

the need for cleanup.  *New York v. Speonk Fuel, Inc.*, 3 N.Y.3d 720, 724 (2004); *see also Sunrise*

*Harbor Realty, LLC v. 35th Sunrise Corp.*, 86 A.D.3d 562, 565 (App. Div. 2011) ("[A]

---

[4] The parties, all of whom are organized, were doing business, or owned property in New York, agree that New York law applies to all state law claims asserted.  *Accord Geron*, 736 F.3d at 221-20 (under the applicable "interest analysis" for choice of law in tort actions, "the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort" (quotation marks and citation omitted)).

landowner who purchases the property after a spill occurred may be liable if it did nothing after it learned of the discharge and the need for a cleanup."). The property owner's "ability to clean up the contamination" is sufficient to confer "discharger" status under the statute. *See Sunrise Harbor Realty*, 86 A.D.3d at 565.

Here, Plaintiff contends the Getty Defendants' remediation efforts continued after Singer purchased the property in 2011, but the complaint alleges that remediation has failed and suggests Singer has done nothing proactive to cure the problem. *See, e.g.*, Compl. ¶¶ 45, 57, 69, 83. At this stage, the Court must draw all reasonable inferences in Plaintiff's favor, including the inference that Singer, as owner of the former Getty Station, could have done something to abate the contamination. *See Speonk*, 3 N.Y.3d at 724 ("While we decline to specify any particular action that Speonk might have undertaken, we consider it sufficient for purposes of liability here that, with knowledge of its [predecessor's] discharge of oil and the need for cleanup, Speonk did nothing.").

Singer next argues that the claim should be dismissed because no discharge occurred during Singer's ownership of the property. *Speonk Fuel* and *Sunrise Harbor Realty* likewise undercut that argument. *See also State v. C.J. Burth Servs., Inc.*, 79 A.D.3d 1298, 1300-01 (App. Div. 2010) (property owner liable for failure to take action even though did not cause leakage or own property at time leakage began). Again, while the complaint does allege that certain remediation efforts have taken place, presumably through access Singer granted, the efforts allegedly were ineffective. *See* Compl. ¶¶ 38-65, 83. Singer arguably should have done something more proactive to clean up the contamination. *Speonk*, 3 N.Y.3d at 724; *Sunrise Harbor Realty*, 86 A.D.3d at 565.

Finally, Singer argues that the claim should be dismissed because Plaintiff asserted that

no "petroleum" contamination affected its property (*see* CERCLA discussion, *supra*).  As noted,

however, regardless of how the complaint or briefs attempt to characterize the residual

contamination, this case centers on the release of gasoline, a petroleum product.  As such, the

case falls squarely within the province of the Oil Spill Act.  Singer's motion to dismiss that claim

is denied.

### 2.  Private Nuisance

In order to establish liability under a private nuisance theory, Plaintiff must show that

defendant's conduct:

> is a legal cause of the invasion of the interest in the private use and
> enjoyment of land and such invasion is (1) intentional and
> unreasonable, (2) negligent or reckless, or (3) actionable under the
> rules governing liability for abnormally dangerous conditions or
> activities.

*Scribner v. Summers*, 84 F.3d 554, 559 (2d Cir. 1996) (internal citation and quotation omitted).

If based on an "intentional and unreasonable" invasion, the claim requires that (a) the defendant

acted for the purpose of causing the invasion, or (b) knew that it was resulting or was

substantially certain to result from the defendant's conduct.  *Id.* (quoting *Copart Indus., Inc. v.*

*Consolidated Edison Co.*, 41 N.Y.2d 564, 571 (1977)).  A "negligent or reckless" act or omission

which causes an intrusion can also support a private nuisance claim.  *Id.*

Singer argues that the claim should be dismissed because Plaintiff has not alleged any

*specific* acts or omissions by Singer.  Singer Mem. at 17.  This argument fails, however, because

(as under the Oil Spill Act) the New York Court of Appeals has held that mere "failure to act"

can support a private nuisance claim.  *Copart Indus., Inc.*, 41 N.Y.2d at 570.  Thus, the general

allegation that Singer purchased contaminated property and took no steps to clean it up is legally

sufficient.  *See Shore Realty*, 759 F.2d at 1050-51 (private nuisance claim viable where

23

landowner learned of nuisance on its property and had a "reasonable opportunity to abate it"). Although the complaint is indeed silent as to what specific steps Singer should have taken, nearly three years passed between the time Singer purchased the property and the time this action was filed. It can be inferred that during that time, Singer had a "reasonable opportunity" to abate the continued migration of benzene through groundwater and yet did not do so. *Id.* The allegations are therefore sufficient to state a private nuisance claim against Singer. The motion to dismiss that claim is denied.

### 3. Trespass

"Under New York law, trespass is the intentional invasion of another's property." *Scribner*, 84 F.3d at 557. "To be liable, the trespasser need not intend or expect the damaging consequences of his intrusion; rather, he need only 'intend the act which amounts to or produces the unlawful invasion.'" *Hanna v. Motiva Enters., LLC*, 839 F. Supp. 2d 654, 671 (S.D.N.Y. 2012) (quoting *Scribner*, 84 F.3d at 557). "When trespass claims arise from the movement of noxious liquids from one property to another, the appropriate standard is whether defendants: (1) intended the act which amounts to or produces the unlawful invasion, and (2) had good reason to know or expect that subterranean and other conditions were such that there would be passage of the contaminated water from defendants' to plaintiffs' land." *Id.*

Singer argues that the trespass claim should be dismissed because the complaint alleges only that Singer took title to the property in 2011 and stood by while benzene continued to migrate through groundwater onto Plaintiff's property. *See* Singer Mem. at 19. In response, Plaintiff contends the allegation concerning continued migration of hazardous substances from the former Getty Station is sufficient. *See, e.g.*, Compl. ¶ 130 (continued releases), ¶ 207 (continued migration).

Under New York law, the "intentional act" requirement for trespass is more stringent than the aforementioned requirements for the Navigation Law and private nuisance claims. Compare *Hanna*, 839 F. Supp. 2d at 671 (must "intend the act"), with *Speonk*, 3 N.Y.3d at 724 (doing nothing suffices), and *Shore Realty*, 759 F.2d at 1050-51 (failure to abate suffices). The complaint alleges virtually no facts concerning the acts which precipitated the gasoline spill at Getty Station. *Cf. Hanna*, 839 F. Supp. 2d at 671. The complaint mentions a release of gasoline prior to 1988 but contains no further explanation of that event. *See* Compl. ¶¶ 14, 113. Whatever the details, the complaint is silent as to any intentional act Singer may have taken which could have "amounted to or produced" the subterranean benzene invasion. *Hanna*, 839 F. Supp. 2d at 671. Notably, the initial encroachment onto Plaintiff's property occurred years before Singer bought the former Getty Station. Compl. ¶ 17. On those facts, unlike tort theories which countenance successor-owner liability for failure to clean up or abate contamination, it cannot be said that Singer intended or precipitated a trespass. That claim is dismissed.

### 4. Strict Liability

Next, New York common law imposes strict liability on landowners for certain abnormally dangerous or ultra-hazardous activities taking place on their property. *See Doundoulakis v. Town of Hempstead*, 42 N.Y.2d 440, 448 (1977). Singer argues that the strict liability claim should be dismissed because gasoline storage and use is commonplace and not considered abnormally dangerous or ultra-hazardous. *See* Singer Mem. at 20 (citing authorities). Plaintiff responds that the claim survives because the basis for strict liability is not gasoline storage, but rather, "the handling (or mishandling) of the hazardous wastes, solid wastes and hazardous substances" at and from Getty Station and the "deliberate failure to control the migration of chemicals." Plaintiff's Mem. at 31.

25

Singer is correct that storage and use of gasoline at filling stations is not considered abnormally dangerous and does not support strict liability, *see 750 Old Country Road Realty Corp. v. Exxon Corp.*, 645 N.Y.S.2d 186, 87 (App. Div. 1996), and this settled law undercuts the argument that the handling and clean-up of gasoline residue supports a strict liability claim. Various arguments can be made under the factors laid out in the Restatement (*see* Plaintiff's Mem. at 32), but absent New York state authority holding that the clean-up of spilled gasoline is abnormally dangerous or ultra-hazardous, this Court declines to make that leap.

Moreover, the gravamen of Plaintiff's argument here is that mishandling contaminant remediation is ultra-hazardous. And yet the complaint does not allege that Singer was involved in the remediation. Indeed, Plaintiff pleads and argues the opposite in support of other claims. Although Singer's passive role may support liability on grounds such as nuisance or negligence, that role undercuts the contention that Singer is strictly liable under common law for "handling (or mishandling) of the hazardous wastes." Plaintiff's Mem. at 31. Singer's passive role also distinguishes this case from scenarios where landowners actively continue to store or maintain toxic substances on the premises. *See, e.g.*, *Shore Realty*, 759 F.2d at 1051-52 (defendant's "maintenance of the site—for example, allowing corroding tanks to hold hundreds of thousands of gallons of hazardous waste—constitutes abnormally dangerous activity and thus constitutes a public nuisance").

For these reasons, the Court finds the pleading inadequate to support a common law strict liability claim against Singer. Singer's motion to dismiss that claim is granted.

### 5.  Negligence

Finally, negligence requires a duty owed and breached, damages, and causation. *McCarthy v. Olin Corp.*, 119 F.3d 148, 161 (2d Cir. 1997). Singer argues that Plaintiff has not

alleged that Singer breached any duty.  Plaintiff responds that the complaint does, in fact, assert a breach of duty:  knowingly allowing contamination to migrate onto a neighbor's property.  *See* Compl. ¶ 102.

In contrast to the common law strict liability analysis, the complaint adequately alleges a breach of duty for negligence purposes.  Two interrelated principles support this conclusion. First, landowners owe a duty to keep their land safe, which runs to tenants, patrons, invitees, and also those in close proximity for whom injury is foreseeable.  *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 290 (2001) ("A landowner who engages in activities that may cause injury to persons on adjoining premises surely owes those persons a duty to take reasonable precautions to avoid injuring them.").  Second, that duty arises not only when *a landowner* creates a dangerous condition on the land, but also when a third-party or force majeure creates it and the landowner knowingly fails to cure it.  *See id.* at 288-89 (landowners' "special relationship puts them in the best position to protect against the risk," even if the risk arises from the harmful conduct of others).  In short, under the negligence principles applicable to landowners, the mere failure to abate a known dangerous condition is a cognizable breach of duty.  In this way, the negligence claim is much like the Navigation Law and private nuisance claims.  Plaintiff adequately has alleged landowner failure to abate a known dangerous condition from 2011, when Singer purchased the property, through the present.  Singer's motion to dismiss the negligence claim is denied.

## IV. CONCLUSION

For the reasons stated above, both motions to dismiss the CERCLA claim are GRANTED.  The Getty Defendants' motion to dismiss the RCRA claim is DENIED.  Singer's motion to dismiss the state law claims is GRANTED as to trespass and common law strict

liability, but is DENIED as to Navigation Law § 181(1), private nuisance, and negligence.

The Clerk of Court is respectfully requested to terminate the motions at docket numbers 34 and 36.  Defendants shall serve and file their answers to the complaint by January 21, 2015.

Dated: December 16 2014
       White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge