# EXHIBIT A

RECEIVED

JAN 21 2014

U.S.D.C.
WP

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WHITE PLAINS HOUSING AUTHORITY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) NO. 13 CV 6282 (NSR) |
| | ) |
| GETTY PROPERTIES CORPORATION, | ) SECOND AMENDED COMPLAINT |
| TYREE ENVIRONMENTAL CORPORATION, | ) |
| SINGER REAL ESTATE GROUP, LLC, | ) |
| MICHAEL C. KENNY, | ) |
| KENNETH C. SEUS, | ) |
| | ) |
| Defendants. | ) |

Plaintiff, the White Plains Housing Authority ("Plaintiff" or "WPHA"), for its Second Amended Complaint against Defendants Getty Properties Corporation, Tyree Environmental Corporation, Singer Real Estate Group LLC, Michael C. Kenny, and Kenneth C. Seus (collectively "Defendants"), states and alleges as follows:

### NATURE OF THE ACTION

1.      This is a civil action brought by Plaintiff pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq.; Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq.; New York State Navigation Law, N.Y. Nav. Law § 181(5); and state law regarding private nuisance, trespass, strict liability and negligence, seeking response costs, declaratory relief, injunctive relief, damages, and attorneys' fees and costs for Defendants' contamination of Plaintiff's real property located at and in the vicinity of 159 South Lexington Ave., White Plains, New York.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of the Counts I, II, and III

pursuant to § 113(b) of CERCLA, 42 U.S.C. § 9613(b); § 7002(a) of RCRA, 42 U.S.C.

§ 6972(a); the Declaratory Judgment Act, 28 U.S.C. § 2201; and federal question jurisdiction, 28

U.S.C. § 1331.

3.      This Court has supplemental jurisdiction over Counts IV, V, VI, VII and VIII

under 28 U.S.C. § 1367 because the New York State Navigation Law claim, and the state law

private nuisance, trespass, strict liability and negligence claims are so related to the federal

claims in this action that they form the same case and controversy under Article III of the United

States Constitution.

4.      Venue is proper in the Southern District of New York pursuant to 42 U.S.C.

§ 9613(b); 42 U.S.C. § 6972(a); and 28 U.S.C § 1391(b) because the actual and threatened

endangerments, releases, injuries, and damages at issue are taking place and have taken place in

this district.

5.      On or about January 9, 2013, Plaintiff, in a Notice of Endangerment, provided

notice of the actual and threatened endangerments, releases, injuries, and damages alleged herein

to: (1) the Administrator of the Environmental Protection Agency ("EPA"); (2) the State of New

York; and (3) Defendants.  Plaintiff's Notice of Endangerment complies with § 7002(b)(2)(A) of

RCRA, 42 U.S.C. § 6972(b)(2)(A), and 40 C.F.R. part 254.

6.      Plaintiff waited at least ninety (90) days after receipt of Plaintiff's Notice of

Endangerment by EPA, the State of New York and Defendants before filing this action.

## THE PARTIES

7.      Plaintiff is a municipal housing authority, existing under the laws of the State of New York.

8.      Plaintiff is a "person" as that term is defined in § 101(21) of CERCLA, 42 U.S.C. § 9601(21).

9.      Plaintiff owns and operates a five apartment building multifamily residential public housing known as Winbrook apartments located in downtown White Plains, New York. ("WPHA's Property").

10.     Building 159, located at 159 South Lexington Ave., White Plains, New York, is one of the five buildings of Winbrook apartments.

11.     Defendant Getty Properties Corporation ("Defendant Getty" or "Getty") is a corporation organized and existing under the laws of the State of Delaware and is doing business in the State of New York.

12.     Defendant Getty is a "person" as that term is defined in § 101(21) of CERCLA, 42 U.S.C. § 9601(21).

13.     Defendant Getty operated a retail gasoline filling station, Getty Station No. 00369 at 26 East Post Road, White Plains, New York ("former Getty Station"), which is adjacent to the WPHA's Property.

14.     Defendant Getty operated the former Getty Station from approximately 1973 until in or about 1988, during which period hazardous wastes, solid wastes and hazardous substances were released into the environment at and from the former Getty Station.

3

15.     Defendant Tyree Environmental Corporation ("Tyree") is a corporation organized and existing under the laws of the State of Delaware and is doing business in the State of New York.

16.     Defendant Tyree is a "person" as that term is defined in § 101(21) of CERCLA, 42 U.S.C. § 9601(21).

17.     Defendant Tyree operated treatment systems at the former Getty Station from 2001 until in or about 2009, during which period hazardous wastes, solid wastes and hazardous substances released into the environment at and from the former Getty Station continued to migrate from the former Getty Station and its treatment systems onto the Plaintiff's adjacent property.

18.     Defendant Singer Real Estate Group LLC ("Singer") is a limited liability company organized and existing under the laws of the State of New York.

19.     Defendant Singer is a "person" as that term is defined in § 101(21) of CERCLA, 42 U.S.C. § 9601(21).

20.     Defendant Singer is the current owner of the former Getty Station.

21.      During Singer's ownership hazardous wastes, solid wastes and hazardous substances continue to migrate from the former Getty Station onto the Plaintiff's adjacent property.

22.     Defendant Michael C. Kenny is a resident of the State of Vermont.

23.     Defendant Michael C. Kenny is a "person" as that term is defined in § 101(21) of CERCLA, 42 U.S.C. § 9601(21).

24.     Defendant Michael C. Kenny owned the former Getty Station from 1994 until 2011, during which period hazardous wastes, solid wastes and hazardous substances were

released into the environment at and from the former Getty Station and continued to migrate onto Plaintiff's adjacent property.

25.     Defendant Kenneth C. Seus is a resident of the State of Massachusetts.

26.     Defendant Kenneth C. Seus is a "person" as that term is defined in § 101(21) of CERCLA, 42 U.S.C. § 9601(21).

27.     Defendant Kenneth C. Seus owned the former Getty Station from 2005 until 2011, during which period hazardous wastes, solid wastes and hazardous substances were released into the environment at and from the former Getty Station and continued to migrate onto Plaintiff's adjacent property.

28.     During the period April 13, 2005 to February 8, 2011, Defendants Michael C. Kenny and Kenneth C. Seus co-owned the former Getty Station.

## FACTS

### Contamination of the White Plains Housing Authority's Property From the Former Getty Station

29.     Building 159 and its parking lot are adjacent to the former Getty Station.

30.     Approximately 350 people, including children and elderly people, live in Plaintiff's Building 159.

31.     As of July 2011 or earlier, hazardous wastes, solid wastes and hazardous substances released at and from the former Getty Station had migrated under Building 159's parking lot, which is directly adjacent to the former Getty Station, in the general direction of Building 159 itself.

32.     On information and belief, as of October 2013, a portion of the plume of contamination from the former Getty Station has migrated under one wing of Building 159.

33.     The hazardous wastes, solid wastes and hazardous substances released at and from the former Getty Station include benzene and other volatile organic compounds.

34.     Benzene is classified by the EPA as a known human carcinogen.

35.     In or about 2001, Getty retained Tyree, an environmental firm, in connection with the contamination at the former Getty Station property.

36.     According to Tyree, groundwater underlying the former Getty Station travels in a north and northwesterly direction from the former Getty Station.

37.     The WPHA's Property, particularly Building 159, is in the direction of the groundwater plume.

38.     The discharge of contamination at the former Getty Station itself was initially reported to the New York Department of Environmental Conservation ("NYDEC") in or about February 1998 and in 2000 Getty obtained consent from Plaintiff to periodically conduct monitoring in the parking lot adjacent to the former Getty Station.

39.     On information and belief, from August 2001 to April 2007, Tyree operated a dual phase high vacuum extraction system at the former Gerry Station property.

40.     On information and belief, in April 2007, Tyree deliberately and intentionally terminated the dual phase high vacuum extraction system at the former Getty Station property and substituted a less effective enhanced vapor/fluid recovery "program".

41.     On information and belief, that "program" consisted of only monthly ineffective attempts to have a portable system vacuum up contamination, and even that minimal effort was terminated by Tyree in 2009.

42.     On information and belief, Getty knew and approved of the cost saving steps referenced in paragraphs 40 and 41 above.

43.     In or about February 2011, Singer acquired the contaminated former Getty Station knowing that it had been contaminated.

44.     WPHA's Building 159 and its parking lot are in plain view of the property Singer was acquiring. Accordingly, on information and belief, Singer also knew that Plaintiff's Building 159 and its parking lot were immediately adjacent to the former Getty Station.

45.     Beginning late in 2011, WPHA was contacted by Tyree, on behalf of Getty, to obtain WPHA's consent to conduct a test of a chemical process known as ozone injection in the Plaintiff's parking lot located between the former Getty Station and Building 159.

46.     In May 2012, Tyree provided WPHA with a September 2011 monitoring report that summarized its operations at the former Getty Station.

47.     The September 2011 Tyree monitoring report also included samples taken on the WPHA's Property in July 2011, including at two monitoring wells, MW-101 and GP-19.

48.     The September 2011 Tyree monitoring report and the Tyree ozone injection work plan both contained maps that included Plaintiff's parking lot, labeled as the "Winbrook Apts. Parking Area", but omitted Building 159, which is located immediately on the other side of the parking lot and also failed to show the proximity of the contamination and proposed ozone injection points to Building 159.

49.     Building 159 is in fact located approximately 70 feet west northwest from Getty monitoring well MW-101 and approximately 100 feet northwest of monitoring well GP-19.

50.     The September 2011 Tyree monitoring report of July groundwater results showed that in July 2011, benzene in MW-101 was 224 ppb (parts per billion) and in GP-19 was 708 ppb.

51.     The NYDEC acceptable water quality standard for benzene is 1 ppb. 6 NYCRR § 703.5, Table 1.

52.     Similarly, in MW-101 ethyl-benzene was 1,610 ppb and toluene was 136 ppb and in GP-19 ethyl-benzene was 764 ppb and toluene was 144 ppb.

53.     The NYDEC acceptable water quality standards for ethyl-benzene and toluene are 5 ppb.  6 NYCRR § 703.5, Table 1.

54.     Benzene, ethyl-benzene and toluene are all hazardous substances.

55.     The September 2011 Tyree Report also included sampling data taken on the WPHA's Property going back to July 2010.

56.     On information and belief, prior to May 2012 Tyree did not supply to WPHA any sampling data taken on the WPHA's Property.

57.     The ozone injection process referenced in paragraph 45 above, that Tyree sought to employ in the WPHA's parking lot is a chemical process that can be used to destroy certain contaminants but it does so through a chemical reaction that can itself generate fumes that can enter a nearby structure through underground conduits, such as ducts and pipes.

58.     There are underground conduits, such as ducts and pipes that enter Building 159.

59.     Tyree asserted that the NYDEC had consented to the ozone injection.

60.     Plaintiff objected to the NYDEC that the proposed injection locations were in close proximity to Building 159, which was not even shown on the September 2011 Tyree monitoring report or ozone injection work plan, that the full extent of the plume of contamination had not been characterized, and that under good environmental practice a remedy should not be tested or undertaken until the full extent of the plume is known.

61.     Plaintiff requested that Tyree be directed to delineate the entire plume, including the north and northwest portion of the plume in the direction of Building 159, and be directed to revise all of its maps to include Plaintiff's Building 159 and the immediately surrounding area.

62.     Thereafter, in March 2013, Tyree, on behalf of Getty, submitted to the NYDEC a revised work plan that called for additional testing of the extent of the plume on the WPHA's Property, did not involve ozone injection, and for the first time showed the location of Building 159.

63.     In March 2013, a conference call was held among the NYDEC, environmental consultants to Plaintiff, and counsel for the Plaintiff, Tyree and Getty.  As a result, all remaining differences as to the scope of the work plan appeared to have been resolved.

64.     Getty, however, did not cause Tyree to implement the March 2013 work plan, but in August 2013 asserted for the first time through its counsel that it had not received NYDEC approval for the March 2013 work plan.  When notified of that fact, the NYDEC promptly approved the work plan.

65.     In October 8-10, 2013, Tyree on behalf of Getty oversaw the implementation of the March 2013 work plan to investigate the further extent of the contamination on the WPHA property.  Additional monitoring wells were installed, and soil and groundwater samples taken.

66.     Duplicate samples were taken on behalf of Plaintiff by its environmental consulting firm, First Environment.

67.     Because Tyree had not sampled MW-101, First Environment also sampled that well separately later in October 2013.

68.     In November 2013, Tyree filed a report with the NYDEC of the October 2013 sampling.

69.     The November 2013 Tyree report failed to contain a map of the plume from the former Getty Station and was misleading in its characterization of the contamination as "petroleum impacted" when in fact what migrates through the groundwater is not petroleum but individual chemical constituents, including benzene.

70.     Additionally, the November 2013 Tyree report had numerous other deficiencies, including that it: failed to mention that certain soil boring and monitoring wells were on the WPHA's Property; failed to mention that all but two of the permanently installed monitoring wells on the WPHA's Property contained benzene above NYDEC cleanup criteria; suggested that the high concentrations of contaminated soils under the WPHA's Property did not need to be remediated; failed to provide any modeling showing how far and at what concentrations the plume can be expected to travel; failed to adequately delineate the full extent of soil and groundwater contamination on the WPHA's Property and  failed to mention or address the potential for vapor intrusion into the WPHA's Building 159.

71.     On December 30, 2013, First Environment provided a Report of its sampling data and a detailed critique of the November 2013 Tyree report documenting the above and other deficiencies.

72.     Figure 1 of First Environment's December 2013 Report showed the extent of the benzene plume from the former Getty Station based on the July 2011 data, and Figure 2 of First Environment's Report showed the extent of the benzene plume from the former Getty Station in October 2013. (Copies of Figures 1 and 2 are attached to this Second Amended Complaint.)

73.     According to First Environment, Figure 1 showed that in July 2011 the benzene plume from the former Getty Station was continuing to migrate off of the former Getty Station toward and onto the WPHA's Property.

74.     According to First Environment, Figure 2 showed that, as of October 2013, the benzene plume has continued to migrate past the Building 159 parking lot, that the shape of the plume is incomplete due to a lack of sampling results, and that First Environment could conclude from Figure 2 that the leading edge of the benzene plume equal to or above the NYDEC standard has already migrated underneath one wing of Building 159 and continues to spread toward the basketball courts area and beyond on the WPHA's Property.

75.     Without limiting the foregoing, in October 2013, a newly installed well in the Building 159 parking lot, MW-107, had 475 ppb benzene in groundwater; a newly installed well within about 10 feet from Building 159, MW-103, had 7.3 ppb benzene in groundwater; and a well alongside Building 159 next to a walkway, MW-104, had 4.2 ppb benzene in groundwater. All of those monitoring wells are on the WPHA's Property.

76.     MW-104 is less than 10 feet from a water line that enters Building 159's basement.  The data also showed that benzene had spread to the far side of basketball courts that are opposite Building 159.

77.     When MW-107 was installed in October 2013, soil samples were also taken beneath the asphalt covering the Building 159 parking lot. Those samples showed that at a depth of 4' to 5' the soil under the parking lot contained 331 ppb benzene and at 5' to 6' the soil contained 472 ppb benzene.

78.     On information and belief, the benzene and other contamination found in the soil under the Building 159 parking lot is due to the groundwater plume migrating from the former Getty Station.

79.     Defendants: failed to take proper precautions to ensure that the treatment of hazardous wastes, solid wastes and hazardous substances released at and from the former Getty

11

Station was done in a manner that would prevent migration of the contamination onto the WPHA's Property; failed to delineate the extent of the plume of contamination on the WPHA's Property; failed to delineate the extent of soil contamination on the WPHA's Property; and failed until 2013 to even show the presence of Building 159 on maps submitted to the NYDEC.

80.     At all times relevant to this Second Amended Complaint, Building 159 was and is in plain view of anyone conducting environmental remediation on the former Getty Station property.

81.     Defendants thus were aware at all relevant times that the former Getty Station was adjacent to the WPHA's Property, including Building 159, and that Plaintiff's tenants occupied Building 159.

82.     The treatment, storage, and transportation of the hazardous wastes, solid wastes and hazardous substances at the former Getty Station was and is inherently dangerous work.

83.     The hazardous wastes, solid wastes and hazardous substances released at and from the former Getty Station have migrated and continue to migrate through the environment, including without limitation in the groundwater moving onto the WPHA's Property and may present an imminent and substantial endangerment to human health and the environment.

84.     Plaintiff has begun a long-term project estimated to cost in the range of $350 million to replace all of the five buildings on the WPHA's Property, including Building 159, with new, modern, energy efficient buildings without displacing from the complex any of the existing tenants.

85.     Plaintiff broke ground on the first of the new buildings on January 15, 2014.

86.     On information and belief, the presence of soil contamination and groundwater contamination from the former Getty Station on the WPHA's Property will prevent or materially

interfere with the financing for construction of this project in the vicinity of Building 159, and may adversely impact the financing for construction of other buildings and amenities on the WPHA's Property.

87.     On information and belief, the contamination on the WPHA's Property will also pose an imminent and substantial endangerment to the workers who will need to excavate soils or who will come into contact with groundwater in the vicinity of Building 159.

88.     Plaintiff has not consented to any contamination remaining on its Property.

**Contamination from the Former Getty Station has Damaged Plaintiff**

89.     Plaintiff has incurred and will continue to incur costs in responding to the contamination and potential risk from the contamination migrating from the former Getty Station onto the WPHA's Property.

90.     Plaintiff's costs have and will include costs of an environmental consulting firm to conduct sampling on the WPHA's Property, to review and evaluate: data regarding contamination migrating onto the WPHA's Property from the former Getty Station; Tyree's proposed pilot ozone injection work plan; Tyree's March 2013 subsurface investigation work plan; Tyree's implementation of that work plan in October 2013; and to provide comments on Tyree's report of the data collected in October 2013.

91.     Plaintiff has and will continue to incur attorneys' fees.

92.     Financing for the construction referred to in paragraphs 84 through 87 of this Second Amended Complaint in the vicinity of Building 159 will in significant part be dependent on grants and other funding from the United States Housing and Urban Development Agency ("HUD"), as well as from other state and local governmental agencies.

93.     HUD regulations prohibit any proposed development of contaminated properties and require an environmental review for all projects involving five or more dwelling units. 24 CFR §58.5(i)(2).

94.     On information and belief, the combination of the contamination from the former Getty Station on the WPHA's Property, and the inability to obtain HUD financing because of that contamination, will deter and prevent other state and local governmental agencies from providing financing.

95.     Financing from bank sources will also be prevented or made far more costly by the contamination on the WPHA's Property from the former Getty Station.

96.     In August 2013, the Office of the Comptroller of the Currency warned banks against lending on environmentally contaminated property and that: "Contamination may decrease the collateral's value or render the collateral worthless." U.S. Department of the Treasury, Office of the Comptroller of the Currency, Comptroller's Handbook: Commercial Real Estate Lending, August 2013.

97.     In summary, on information and belief, the contamination migrating from the former Getty Station, in addition to presenting a potentially imminent and substantial endangerment to human health and the environment, will prevent financing for new construction in the vicinity of what is now Building 159 and its adjacent areas to which the contamination from the former Getty Station has spread unless all of that contamination is fully remediated.

98.     Plaintiff did not cause or contribute to the contamination that has harmed the value of its Property.

99.     Plaintiff seeks immediate remediation of all of the contamination in the vicinity of Plaintiff's Building 159 and its adjacent areas in order to eliminate the potential threats to human

health and the environment and to abate the damage to its financing of replacement of its buildings as aforesaid.

100.   Plaintiff also seeks monetary damages for the costs that Plaintiff has incurred and will incur responding to the contamination migrating from the former Getty Station, damages for the interference with the financing of its replacement of Building 159 and construction of other building and amenities on its Property, and the cost of restoring its Property to the condition it was in prior to the contamination migrating from the former Getty Station.

101.   Defendants' activities involved the use of hazardous wastes, solid wastes and hazardous substances that, when released, are harmful to human health, the environment and real property value.  Under applicable federal and state law, Defendants as set forth below are strictly liable, jointly and severally, for all costs and damage caused by Defendants' releases of hazardous wastes, solid wastes and hazardous substances and for the abatement of the risks and damages associated with Defendants' activities.

102.   By their continuing failure to act to address this situation properly and promptly and in a reasonable manner, Defendants have allowed contamination to migrate from the former Getty Station onto the WPHA's Property, which has caused damage, and continues to cause damage to the WPHA's Property and to the WPHA.

### CLAIMS FOR RELIEF

### Count I
### Cost Recovery Under 42 U.S.C. § 9607(a)

103.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 102 of this Second Amended Complaint.

104.   Section 107(a) of CERCLA, under which Plaintiff brings this Count I, authorizes "any … person" to bring a lawsuit against any entity that falls within the four categories of

parties made liable by Congress to recover the "necessary costs of response" incurred "consistent with the national contingency plan" ("NCP"), plus interest.  42 U.S.C. § 9607(a)(1)-(4)(B).

105.    Subject only to narrow defenses and limitations of liability set forth in CERCLA, the "necessary costs of response" may be recovered from any liable party when: (1) a release or threatened release; (2) from a facility; (3) of a hazardous substance; (4) causes the incurrence of the "necessary costs of response".  42 U.S.C. § 9607(a)(1)-(4)(B).

106.    The four categories of parties made liable by Congress are: (1) "the owner and operator of …a facility"; (2) "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of"; (3) "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances"; and (4) "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person".  42 U.S.C. § 9607(a)(1)-(4).

107.    The term "hazardous substance" as that term is used in CERCLA, defined in 42 U.S.C. § 9601(14), means any substance designated under the statutes listed in subparagraphs (A) through (F).  *Id.*

108.    CERCLA's definition of hazardous substances, 42 U.S.C. § 9601(14),  "does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph."

109.    Benzene and certain of the other volatile organic compounds that have dissolved in groundwater under the former Getty Station and migrated onto the WPHA's Property are

listed or designated as a hazardous substance under subparagraphs (A) through (F) of 42 U.S.C. § 9601(14).

110.     The term "fraction" of petroleum or crude oil is a term of art that refers to the fractional vertical distillation process that is and has been central to the petroleum industry since the 1930s.

111.     Crude oil first goes through a desalting process. "The desalted crude oil is then heated in a heat exchanger and furnace to about 750 degrees (F) and fed to a vertical, distillation column at atmospheric pressure where most of the feed is vaporized and separated into its various fractions by condensing on 30 to 50 fractionation trays, each corresponding to a different condensation temperature. The lighter fractions condense and are collected toward the top of the column.  Heavier fractions, which may not vaporize in the column, are further separated later by vacuum distillation . . . . Fractions obtained from atmospheric distillation include naphtha, gasoline, kerosene, light fuel oil, diesel oils, gas oil, lube distillate, and heavy bottoms." U.S. EPA, Office of Compliance Sector Notebook Project, Profile of the Petroleum Refining Industry at 17. The fractional distillation process is explained in more detail in Perry, John H., Chemical Engineers' Handbook, 3d edition, and is illustrated below.

# Fractional Distillation process



The oil refining process starts with a fractional distillation column.

 112. Although benzene may in its pure form also be removed from petroleum in a

secondary distillation process for use in certain industrial applications, on information and belief,

no pure benzene was stored at the former Getty Station.

 113. The only fraction of petroleum that was stored at and released from the former

Getty Station was gasoline.

 114. Once in the ground under the former Getty Station, the gasoline which is a

mixture (not a compound) begins separating into its by-products or constituents due to physical,

chemical and biological actions.[1]

---

[1] The term "by-product" means "something that is produced during the production or destruction of something else." Merriam-Webster Online Dictionary.

115.     One of those gasoline by-products or constituents is benzene.  Benzene has a high water solubility coefficient (dissolves easily in water) and because it has a low coefficient of adsorption (it does not tend to adhere to soil) it moves more quickly as part of the groundwater than many other gasoline by-products or constituents.

116.     Other gasoline by-products or constituents that are heavier and do not readily dissolve in water will remain for some time near where the spill occurred, and may show a telltale sheen until they are slowly broken down by chemical and biological degradation.

117.     Still other gasoline by-products or constituents like toluene and xylenes that do dissolve in water have a higher coefficient of adsorption – that is they will tend to adhere more to the soils and thus move more slowly than benzene.

118.     The WPHA's Property has not been contaminated by crude oil, petroleum or any "fraction" of either.

119.     The WPHA's Property has been contaminated by the benzene and other volatile organic compounds that became dissolved in the groundwater under the former Getty Station.

120.     The benzene is not floating on the water table but is a part of the groundwater that has migrated from the former Getty Station onto the WPHA's Property and toward and beyond Building 159.

121.     Additionally, some of the soils on the WPHA's Property that are in contact with the contaminated groundwater have also become contaminated with benzene and other volatile organic compounds from the former Getty Station groundwater plume.

122.     The full extent of the soil contamination on the WPHA's Property is not known at this time and has yet to be fully delineated.

123.    The full extent of the groundwater contamination on the WPHA's Property is not known at this time and has yet to be fully delineated.

124.    Defendant Getty is liable under CERCLA as a person who operated the former Getty Station at the time of disposal of hazardous substances released into the environment at that property.

125.    Defendant Tyree is liable under CERCLA as the operator of the treatment systems at the former Getty Station that allowed the migration of contamination onto the WPHA's Property.

126.    Defendant Singer is liable under CERCLA as the current owner of the former Getty Station.

127.    Defendant Michael C. Kenny is liable under CERCLA as a person who owned the former Getty Station at the time of disposal of hazardous substances released into the environment at that property.

128.    Defendant Kenneth C. Seus is liable under CERCLA as a person who owned the former Getty Station at the time of disposal of hazardous substances released into the environment at that property.

129.    Under § 101(22) of CERCLA, the term "release" means: "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)...." 42 U.S.C. § 9601(22).

130.    The hazardous substances spilled at the former Getty Station, which have migrated to the WPHA's Property, have been and are continuing to be "released" within the meaning of CERCLA § 101(22), 42 U.S.C. § 9601(22).

131.    Under § 101(9) of CERCLA, the term "facility" means: "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located...." 42 U.S.C. § 9601(9).

132.    The former Getty Station is a "facility" within the meaning of CERCLA § 101(9), because it is a site "where a hazardous substance has...come to be located...." 42 U.S.C. § 9601(9).

133.    Releases and threatened releases of hazardous substances at and from the former Getty Station have caused, and will continue to cause, Plaintiff to incur necessary costs of response that are consistent with the NCP.

134.    Plaintiff's costs for responding to the contamination migrating from the former Getty Station are consistent with the NCP, 40 C.F.R. part 300, which includes: "methods for evaluating...and remedying any releases or threats of release [of hazardous substances]...which pose substantial danger to the public health or the environment." 42 U.S.C. § 9605(a).  Subpart H of the NCP provides the requirements for private party cleanups.  40 C.F.R. § 300.700.

135.    Plaintiff's costs have also included Plaintiff's attorneys' costs necessary to adequately identify the potentially responsible parties for purposes of negotiations and this Second Amended Complaint, which pursuant to *Key Tronic Corporation v. United States*, 511 U.S. 809, 820 (1994) constitute CERCLA response costs consistent with the NCP.

<u>**Count II**</u>
<u>**Declaratory Relief Under 28 U.S.C. § 2201 and 42 U.S.C. 9613(g)(2)**</u>

136.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 135 of this Second Amended Complaint.

137.    An actual, substantial, legal controversy now exists between the Plaintiff and the Defendants.  28 U.S.C. § 2201 and 42 U.S.C. § 9613(g)(2).

138.    The Plaintiff requests entry of an order declaring that the Defendants are jointly and severally liable for necessary future costs of investigation and cleanup consistent with the NCP in subsequent actions for future response costs. 28 U.S.C. § 2201 and 42 U.S.C. § 9613(g)(2).

<u>**Count III**</u>
<u>**RCRA 42 U.S.C. § 6972**</u>

139.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 138 of this Second Amended Complaint.

140.    Section 7002(a)(1)(B) of RCRA, under which Plaintiff brings this Count III, authorizes "any person" to bring a lawsuit when: (1) "solid or hazardous waste"; (2) "may present an imminent and substantial endangerment to health or the environment"; and (3) the defendant falls within one of the categories of entities that Congress made liable for taking abatement action. 42 U.S.C. § 6972(a)(1)(B).

141.    The persons declared liable by Congress for potential endangerments under § 7002(a)(1)(B) of RCRA are entities that contributed to "past or present handling, storage, treatment, transportation, or disposal" of the solid or hazardous waste at issue.  These entities include "any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility." 42 U.S.C. § 6972(a)(1)(B).

22

142.    Under § 1004(27) of RCRA, subject to limitations not applicable to this case, the term "'solid waste' means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities...." 42 U.S.C. § 6903(27).

143.    Under § 1004(5) of RCRA, the term "'hazardous waste' means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5).

144.    The administrative regulations promulgated under RCRA contain additional definitions of solid and hazardous waste. 40 C.F.R. Part 261.  However, for purposes of RCRA § 7002(a)(1)(B) citizen suits, the statutory definitions of solid and hazardous waste, set forth in RCRA §§ 1004(27) and (5), apply. 40 C.F.R. § 261.1(b)(2).

145.    The substances released at and from the former Getty Station that have migrated onto the WPHA's Property meet the definitions of "solid waste" and "hazardous waste".

146.    Tyree is a person covered under § 7002(a)(1)(B) of RCRA as an operator of a treatment facility whose acts and omissions caused and contributed to, and continue to cause and contribute to the past or present handling, storage, treatment, transportation, or disposal of solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

147.    Getty oversees Tyree's work at the former Getty Station under arrangements known to Getty and Tyree but not known to Plaintiff.

148.    Getty is a person covered under § 7002(a)(1)(B) of RCRA as a generator and as an operator of a treatment facility whose acts and omissions caused and contributed to, and continue to cause and contribute to the past or present handling, storage, treatment, transportation, or disposal of solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

149.    Michael C. Kenny is a person covered under § 7002(a)(1)(B) of RCRA as a past owner of property whose acts and omissions caused and contributed to, and continue to cause and contribute to the past or present handling, storage, treatment, transportation, or disposal of solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

150.    Kenneth C. Seus is a person covered under § 7002(a)(1)(B) of RCRA as a past owner of property whose acts and omissions caused and contributed to, and continue to cause and contribute to the past or present handling, storage, treatment, transportation, or disposal of solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

151.    The Defendants have not stopped or prevented the potential endangerments and the actual and threatened injuries and damage at issue are ongoing and will persist until enjoined by this Court.

152.    Defendants Getty, Tyree, Michael C. Kenny and Kenneth C. Seus are liable under § 7002(a) of RCRA and that liability is strict, and joint and several.

24

153.    Unless abated by order of this Court, the endangerments complained of will potentially cause irreparable injury to Plaintiff.

154.    Unless abated by order of this Court, the endangerments complained of will potentially cause irreparable injury to human health and the environment at, around, and in the vicinity of the WPHA's Property.

155.    On information and belief, neither EPA nor the State of New York has commenced or is diligently prosecuting an action under RCRA § 7003, 42 U.S.C. § 6973, or CERCLA § 106, 42 U.S.C. § 9606, to abate the endangerments at issue.

156.    Neither EPA nor the State of New York is actually engaging in a removal action under CERCLA § 104, 42 U.S.C. § 9604, to abate the endangerments at issue.

157.    Neither EPA nor the State of New York has incurred costs to initiate a Remedial Investigation and Feasibility Study under CERCLA § 104, 42 U.S.C. § 9604, or is diligently proceeding with a remedial action under CERCLA to abate the endangerments at issue.

158.    No responsible party is diligently conducting a removal action, Remedial Investigation and Feasibility Study, or proceeding with a remedial action pursuant to a judicial or administrative order obtained by EPA under RCRA § 7003, 42 U.S.C. § 6973, or CERCLA § 106, 42 U.S.C. § 9606, to abate the endangerments at issue.

159.    Without limiting the foregoing, in response to Freedom of Information Law requests for copies of all writings pertaining to the former Getty Station, although the NYDEC assigned a spill number to the former Getty Station site in 1997 (Spill Number 97-13110) and although Tyree's September 2011 Report shows that beginning in 1998 Tyree had been installing monitoring wells and collecting data at the former Getty Station site, which it was required under

NY law to report to NYDEC, the NYDEC case manager has not produced any records of this site for the entire period of 1997 to 2007.

160.    According to the September 2011 Tyree monitoring report, the NYDEC permitted the shutdown of the dual phase high vacuum extraction system at the former Getty Station in April of 2007.

161.    According to the September 2011 Tyree monitoring report, the NYDEC permitted Tyree to substitute an enhanced vapor/fluid recovery monthly program (meaning a monthly effort to use a truck mounted vacuum system to try to remove some of the contaminated vapor and fluids from some of the wells).

162.    According to the September 2011 Tyree monitoring report, the NYDEC allowed the enhanced vapor/fluid recovery monthly program to be discontinued at the end of 2009.

163.    Since the end of 2009, the NYDEC has not required the remediation of the plume migrating from the former Getty Station.

164.    On January 8, 2014, First Environment requested the NYDEC undertake a technical review of the handling of the former Getty Station site by its project manager and the questionable decisions made by the project manager.

165.    The questionable decisions by the project manager included, in November 2011, allowing Tyree to abandon (which means grout up and make unusable) all of the existing on-site monitoring wells on the former Getty Station property even though: (a) July 2011 data showed contamination above NYDEC cleanup standards remained under and continued to migrate off of the former Getty Station; (b) written NYDEC policy regarding decommissioning of monitoring wells required that the wells remain open; and (c) the effect was to prevent the collection of data that could support installation of the most beneficial and efficient remedial technology.

166.   The questionable decisions by the project manager also included, in September 2011, approving a Tyree work plan to conduct an ozone injection pilot study near Building 159 in its parking lot based on drawings that did not show Building 159 or the conduits leading to the building. That Tyree work plan contained no health and safety plan. EPA had cautioned that ozone injection technology posed a risk of fugitive vapors entering building structures and Tyree had conceded to the project manager that the extent of the plume was not fully delineated as required by good engineering practice and NYDEC's Spill Guidance Manual.

167.   The questionable decisions by the project manager further included: (a) significantly downplaying the risk of harm to the WPHA's residents by allowing the plume from the former Getty Station to continue to migrate onto the WPHA's Property; (b) failing to react in a timely manner to the potential that the WPHA's residents were at risk; and (c) in the four and one-half years as the project manager, failing to have the plume from the former Getty Station sufficiently delineated to develop a remedy.

168.   First Environment has requested that the NYDEC replace the project manager.

169.   The mishandling since 1997 by the NYDEC of the plume migrating from the former Getty Station is exactly the type of harm that the citizen suit provisions of RCRA relied on in this case were intended to address.

170.   Plaintiff has served a copy of this Second Amended Complaint on the Attorney General of the United States and on EPA.

171.   Plaintiff is entitled to relief under § 7002(a) of RCRA, 42 U.S.C. § 6972(a), restraining the Defendants (other than Singer) and requiring Defendants (other than Singer) to take such action as may be necessary to abate the potential endangerments at issue or to pay Plaintiff the costs thereof.

172.    Plaintiff is also entitled to an order requiring the Defendants (other than Singer) to pay the Plaintiff's costs of litigation, including reasonable attorney and expert witness fees. RCRA § 7002(e), 42 U.S.C. § 6972(e).

## Count IV
## New York State Navigation Law § 181

173.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 172 of this Second Amended Complaint.

174.    Under § 181 of the New York State Navigation Law, under which Plaintiff brings this Count IV, any person who has discharged petroleum is "strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages...." N.Y. Nav. Law § 181(1).

175.    An injured person may bring a strict liability claim directly against any person who has discharged petroleum for the costs of cleanup and removal and direct and indirect damages.  N.Y. Nav. Law § 181(5).

176.    Under § 172(8) of the New York State Navigation Law, the term "'[d]ischarge' means any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of petroleum into the waters of the state or onto lands from which it might flow or drain into said waters, or into waters outside the jurisdiction of the state when damage may result to the lands, waters or natural resources within the jurisdiction of the state". N.Y. Nav. Law § 172(8).

177.    The "waters...within the jurisdiction of the state" include groundwater.

178.    The spill and release of gasoline, among other substances, at the former Getty Station and into the groundwater meets the definition of a "discharge".

179.     Under § 172(15) of the New York State Navigation Law, the term "'[p]etroleum'

means oil or petroleum of any kind and in any form including, but not limited to, oil, petroleum,

fuel oil, oil sludge, oil refuse, oil mixed with other wastes and crude oils, gasoline and kerosene".

N.Y. Nav. Law § 172(15).

180.     The spill and release of gasoline, among other substances, at the former Getty

Station meet the definition of spill of "petroleum" under the Navigation Law.

181.     Defendants' discharges of gasoline at the former Getty Station has caused

benzene and other volatile organic compounds to migrate in dissolved form onto the WPHA's

Property causing damage to WPHA and to its Property.

182.     Benzene is a by-product of gasoline that may dissolve in groundwater after a

gasoline spill and is considered a by-product of the gasoline that is covered under the New York

State Navigation Law.

183.     Defendants are strictly liable under the New York State Navigation Law as

persons who discharged petroleum at and from the former Getty Station causing direct and

indirect damages to Plaintiff.

184.     Under applicable case law, that liability is joint and several.

185.     Pursuant to § 181(5) of the New York State Navigation Law, Plaintiff is entitled

to an award of cleanup and removal costs and direct and indirect damages, including attorneys'

fees that were incurred by Plaintiff as a result of the discharge and migration of the

contamination, plus interest.

186.     Pursuant to applicable case law, including *AMCO International, Inc. v. Long

Island Railroad Co.*, 754 N.Y.S.2d 655, 657 (N.Y. App. Div. 2003), the WPHA is also entitled

to have its Property fully restored to its pre-spill condition.

## Count V
## Private Nuisance

187.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 186 of this Second Amended Complaint.

188.    Under New York common law, under which Plaintiff brings this Count V, private nuisance "is actionable by the individual person or persons whose rights have been disturbed" when there is "an interference with the use or enjoyment of land". *Copart Industries, Inc. v. Consolidated Edison Co. of New York, Inc.*, 362 N.E.2d 968, 971 (N.Y. 1977).

189.    A defendant is liable "for a private nuisance if his conduct is a legal cause of the invasion of interest in the private use and enjoyment of land and such invasion is (1) intentional and unreasonable, (2) negligent or reckless, or (3) actionable under the rules governing liability for abnormally dangerous conditions or activities". *Id.*

190.    Under New York common law, "[o]ne who creates a nuisance through an inherently dangerous activity or use of an unreasonably dangerous product is absolutely liable for resulting damages, irregardless [sic] of fault, and despite adhering to the highest standard of care". *State v. Schenectady Chemicals, Inc.*, 459 N.Y.S.2d 971, 976 (N.Y. Sup. Ct. 1983), *aff'd in pertinent part*, 479 N.Y.S.2d 1010 (N.Y. App. Div. 1984).

191.    "[E]veryone who creates a nuisance or participates in the creation or maintenance of a nuisance are liable jointly and severally for the wrong and injury done thereby." *Schenectady Chemicals, Inc.*, 459 N.Y.S.2d at 976.

192.    Under New York common law, "[e]ven a non-landowner can be liable for taking part in the creation of a nuisance upon the property of another." *Id.* at 977.

193.    Plaintiff WPHA owns the WPHA's Property.

194.    Defendants' acts and omissions have interfered with Plaintiff's use and enjoyment of its Property.

195.    Defendants have acted intentionally and unreasonably and/or negligently and recklessly by failing to contain the source of contamination on and under the former Getty Station and prevent the migration of hazardous wastes, solid wastes and hazardous substances onto the WPHA's Property.

196.    The storage, transportation and treatment of the hazardous wastes, solid wastes and hazardous substances at the former Getty Station constitute abnormally dangerous conditions or activities.

197.    Plaintiff has suffered, and continues to suffer, damages from the private nuisance.

198.    Unless abated by order of this Court, the private nuisance will continue to cause Plaintiff irreparable injury.

199.    Unless abated by order of this Court, the private nuisance will cause irreparable injury to human health and the environment in, at, around and in the vicinity of the WPHA's Property.

200.    Unless abated by order of this Court, the private nuisance has and will continue to interfere with the use of the WPHA's Property as collateral for construction loans, would likely prevent HUD and other funding for such loans in the area that is contaminated, and has and will continue to force Plaintiff to incur costs responding to the contamination and potential risk.

201.    Defendants' liability to abate the private nuisance is strict, joint and several.

## Count VI
## Trespass

202.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 201 of this Second Amended Complaint.

203.    To be liable, the trespasser "need not intend or expect the damaging consequence of his intrusion"; he need only "intend the act which amounts to or produces the unlawful invasion, and the intrusion must…be the immediate or inevitable consequence of what he willfully does, or which he does so negligently as to amount to willfulness." *Phillips v. Sun Oil Co.*, 121 N.E. 249, 250–51 (N.Y. 1954).

204.    Defendants had good reason to know and did know that unless effectively controlled, the contamination on the former Getty Station property would migrate, and in fact had migrated, onto the WPHA's Property and Defendants intended the acts that failed to control the migration of the pollution onto the WPHA's Property.

205.    Under New York common law, when "polluting material has been deliberately put onto, or into, defendant's land" the defendant is liable for damage to his neighbor's land if the defendant "had good reason to know or expect that subterranean and other conditions were such that there would be passage from defendant's to plaintiff's land". *Id.* at 251.

206.    Tyree and Getty knew that the direction of groundwater flow from the former Getty Station property onto the WPHA's Property would and did result in the contamination of the WPHA's Property, and knew and had good reason to know that the deliberate termination in April 2007 of the operation of the dual phase high vacuum extraction system on the former Getty Station property would exacerbate and worsen the ongoing pollution of the WPHA's Property.

207.    After Singer knowingly acquired contaminated property, it knowingly and deliberately took no steps to control the continued migration from its property onto the WPHA's Property.

208.    Defendants' acts and omissions have caused the invasion of hazardous wastes, solid wastes and hazardous substances onto the WPHA's Property.

32

209.    Defendants have allowed the invasion of hazardous wastes, solid wastes and hazardous substances onto the WPHA's Property to continue for years without implementing remedial actions to effectively prevent the further migration of such contamination.

210.    The invasion of Defendants' hazardous wastes, solid wastes and hazardous substances onto the WPHA's Property has damaged the value of the WPHA's Property as collateral for construction loans, would likely prevent HUD and other funding for such loans in the area that is contaminated, and forced Plaintiff to incur costs responding to the contamination and potential risk.

211.    Unless abated by order of this Court, the trespass will continue to cause Plaintiff irreparable injury.

212.    Unless abated by order of this Court, the trespass will cause irreparable injury to human health and the environment in, at, around and in the vicinity of the WPHA's Property.

## Count VII
## Strict Liability in Tort

213.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 212 of this Second Amended Complaint.

214.    Those who engage in an activity that is abnormally dangerous or ultra-hazardous are strictly liable for the harm caused by the activity "[j]ust as the landowner is responsible because for his own benefit he has chosen to engage in an activity of sufficiently high risk of harm to others...." *Doundoulakis v. Town of Hempstead*, 368 N.E.2d 24, 27, 29 (N.Y. 1977).

215.    Under New York common law, "From review of the authorities there emerges a dominant theme, viz., that strict liability will be imposed upon those who engage in an activity which poses a great danger of invasion of the land of others." *Id.* at 27–28.

216.    The treatment, disposal, storage and handling (or mishandling) of the hazardous wastes, solid wastes and hazardous substances, at and from the former Getty Station constitute abnormally dangerous or ultra-hazardous activities that resulted in a great danger and the actual occurrence of invasion of Plaintiff's adjacent property.

217.    The treatment, disposal, storage and handling in such a manner that allowed the release and continued migration of hazardous wastes, solid wastes and hazardous substances onto adjacent property is not a matter of common usage where the WPHA's Property is located.

218.    The danger of Defendants' activities in failing to control the migration of contamination outweighs any value to the community.

219.    Defendants' activities presented, and continue to present, a risk of harm to the WPHA's Property.

220.    As a proximate result of Defendants engaging in such abnormally dangerous or ultra-hazardous activities, Plaintiff has sustained injury and suffered losses.

221.    Defendants' abnormally dangerous or ultra-hazardous activities have damaged the value of the WPHA's Property as collateral for construction loans, would likely prevent HUD and other funding for such loans in the area that is contaminated, and forced Plaintiff to incur costs responding to the contamination and potential risk.

## Count VIII
## Negligence

222.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 221 of this Second Amended Complaint.

223.    Under New York common law, under which Plaintiff brings this Count VIII, the elements to establish negligence are: "1) a duty on the part of the defendant; 2) a breach of that duty by conduct involving an unreasonable risk of harm; 3) damages suffered by the plaintiff;

34

and 4) causation, both in fact and proximate, between the breach and the plaintiff's harm."
*McCarthy v. Olin Corp.*, 119 F.3d 148, 161 (2d Cir. 1997) (internal quotation marks and citations omitted).

224.   A landowner who engages in activities that may cause injury to persons on adjacent premises owes those persons a duty to take reasonable precautions to avoid injuring them. *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center Inc.*, 750 N.E.2d 1097, 1102 (N.Y. 2001).

225.   Defendants knew, or should have known, the dangerous, hazardous, and toxic nature of the chemicals released at and from the former Getty Station that Defendants allowed to migrate onto the WPHA's Property.

226.   Defendants knew, or should have known, that the hazardous wastes, solid wastes and hazardous substances were capable of causing serious property damage if released and allowed to migrate.

227.   Defendants owed a duty to Plaintiff, the adjacent property owner, to prevent the spill, release and migration of the hazardous wastes, solid wastes and hazardous substances.

228.   Defendants owed a duty to Plaintiff to take all reasonable measures necessary to protect the public, including Plaintiff and its tenants, from the spill, release and migration of the hazardous wastes, solid wastes and hazardous substances.

229.   Defendants acted negligently in causing the spill, release and continuing migration of the hazardous wastes, solid wastes and hazardous substances by failing to take reasonable measures and precautions necessary to avoid and respond to the contamination and prevent the migration of contamination from the former Getty Station onto the WPHA's Property.

230.   Defendants' acts and omissions were the cause in fact and the proximate cause of the damages and injuries to Plaintiff.

231.   Defendants have allowed the invasion of hazardous wastes, solid wastes and hazardous substances onto the WPHA's Property for years without implementing any effective remedial actions to prevent the further migration of such contamination.

232.   Defendants' failure to prevent the migration of contamination onto the WPHA's Property amounts to gross negligence.

233.   By reason of their negligence, Defendants are liable for all of the damages and injuries to Plaintiffs caused by the spill, release and migration of hazardous wastes, solid wastes and hazardous substances onto the WPHA's Property.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays this Court for judgment as follows:

### **Count I**

On Count I, with respect to all Defendants, Plaintiff asks this Court to:

A.   Order Defendants jointly and severally to pay Plaintiff an amount that will fully and fairly compensate Plaintiff for Plaintiff's necessary costs of response, including attorneys' fees to the extent permitted by law, incurred consistent with the NCP and for prejudgment interest.

### **Count II**

On Count II, with respect to all Defendants, Plaintiff asks this Court to:

B.   Declare, pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 9613(g)(2), that Defendants are jointly and severally liable to pay Plaintiff an amount that will fully compensate Plaintiff for all future response costs and damages.

## Count III

On Count III, with respect to all Defendants (other than Singer), Plaintiff asks this Court to:

C.      Find that Defendants (other than Singer) are jointly and severally liable for taking all necessary action to investigate, abate and otherwise respond to potential endangerments associated with solid or hazardous wastes on the WPHA's Property that have migrated through groundwater from the former Getty Station onto the WPHA's Property.

D.      Enter a mandatory injunction ordering the Defendants (other than Singer) to pay jointly and severally the WPHA an amount of money determined at trial to be sufficient to fund the WPHA's development and implementation of a cost effective plan to: (1) eliminate all unacceptable risks to human health and the environment from the potential endangerment at or affecting the WPHA's Property; and (2) restore the WPHA's Property, as expeditiously as practicable, to the condition it was in prior to the contamination migrating from the former Getty Station; and

E.      Order Defendants (other than Singer) to pay jointly and severally Plaintiff's costs of litigation, including, but not limited to, reasonable attorneys' fees and expert witness fees pursuant to 42 U.S.C. § 6972(e).

## Count IV

On Count IV, with respect to all Defendants, Plaintiff asks this Court to:

F.      Find, pursuant to § 181(5) of the New York State Navigation Law, that Defendants are strictly liable for all costs of cleanup and removal and direct and indirect damages, including attorneys' fees, incurred by the WPHA as a result of the discharge and migration of the contamination onto WPHA's Property, plus interest; and

G.     Require Defendants to implement an appropriate plan to abate the discharge at or from the former Getty Station migrating onto the WPHA's Property, to compensate the WPHA for abatement measures required on the WPHA's Property that Defendants do not themselves implement, and to fully restore the WPHA's Property, as expeditiously as practicable, to the condition it was in prior to the contamination migrating from the former Getty Station including without limitation by the safe and effective treatment of all contaminated groundwater on its property to fully achieve New York water quality standards, the excavation and removal of all soils contaminated by the discharge, and the restoration of all above ground facilities and appurtenances including the parking lot surface, walkways, shrubbery and other appurtenances impacted by the excavation of contaminated soils.

## Count V

On Count V, with respect to all Defendants, Plaintiff asks this Court to:

H.     Find that Defendants are jointly and severally liable (subject to a right of equitable apportionment among them) for taking all necessary action to investigate, abate and otherwise respond to the private nuisance arising from the former Getty Station and affecting the WPHA's Property;

I.      Award the WPHA damages or restitution as appropriate for Defendants' failure to take all necessary actions to prevent, investigate, abate, and otherwise respond to the private nuisance arising from the former Getty Station and harming the WPHA's Property;

J.      Award the WPHA punitive damages for the egregious damage to the WPHA's Property caused by Defendants' wanton and willful or reckless disregard for the WPHA's rights as the adjacent property owner; and

K.      Require Defendants to implement an appropriate abatement plan for actual and threatened releases at or from the former Getty Station and migrating onto the WPHA's Property, to compensate the WPHA for abatement measures required on the WPHA's Property, and to restore the WPHA's Property, as expeditiously as practicable, to the condition it was in prior to the contamination migrating from the former Getty Station including without limitation by the safe and effective treatment of all contaminated groundwater on its property to fully achieve New York water quality standards, the excavation and removal of all soils contaminated by the discharge, and the restoration of all above ground facilities and appurtenances including the parking lot surface, walkways, shrubbery and other appurtenances impacted by the excavation of contaminated soils.

## Count VI

On Count VI, with respect to all Defendants, Plaintiff asks this Court to:

L.      Find that Defendants are jointly and severally liable (subject to a right of equitable apportionment among them) for taking all necessary action to investigate, abate and otherwise respond to the trespass from the former Getty Station and affecting the WPHA's Property;

M.      Award the WPHA damages or restitution as appropriate for Defendants' failure to take all necessary actions to prevent, investigate, abate, and otherwise respond to the trespass from the former Getty Station and affecting the WPHA's Property;

N.      Award the WPHA punitive damages for the egregious damage to the WPHA's Property caused by Defendants' wanton and willful or reckless disregard for the WPHA's rights as the adjacent property owner; and

O.     Require Defendants to implement an appropriate abatement plan for actual and threatened releases at or from the former Getty Station and migrating onto the WPHA's Property, to compensate the WPHA for abatement measures required on the WPHA's Property, and to restore the WPHA's Property, as expeditiously as practicable, to the condition it was in prior to the contamination migrating from the former Getty Station including without limitation by the safe and effective treatment of all contaminated groundwater on its property to fully achieve New York water quality standards, the excavation and removal of all soils contaminated by the discharge, and the restoration of all above ground facilities and appurtenances including the parking lot surface, walkways, shrubbery and other appurtenances impacted by the excavation of the contaminated soils.

## Count VII

On Count VII, with respect to all Defendants, Plaintiff asks this Court to:

P.     Find that Defendants are jointly and severally liable (subject to a right of equitable apportionment among them) for the harm and damage to the WPHA's Property caused by Defendants' treatment, disposal, storage and handling of hazardous wastes, solid wastes and hazardous substances that resulted in the migration of contamination from the former Getty Station to the WPHA's Property;

Q.     Award the WPHA damages or restitution as appropriate for the harm and damage to the WPHA's Property caused by Defendants' treatment, disposal, storage and handling of hazardous wastes, solid wastes and hazardous substances that resulted in the migration of contamination from the former Getty Station to the WPHA's Property;

R.      Award the WPHA punitive damages for the egregious damage to the WPHA's

Property caused by Defendants' wanton and willful or reckless disregard for the WPHA's rights

as the adjacent property owner; and

S.      Require Defendants to implement an appropriate abatement plan for actual and

threatened releases at or from the former Getty Station and migrating onto the WPHA's

Property, to compensate the WPHA for abatement measures required on the WPHA's Property,

and to restore the WPHA's Property, as expeditiously as practicable, to the condition it was in

prior to the contamination migrating from the former Getty Station including without limitation

by the safe and effective treatment of all contaminated groundwater on its property to fully

achieve New York water quality standards, the excavation and removal of all soils contaminated

by the discharge, and the restoration of all above ground facilities and appurtenances including

the parking lot surface, walkways, shrubbery and other appurtenances impacted by the

excavation of the contaminated soils.

## Count VIII

On Count VIII, with respect to all Defendants, Plaintiff asks this Court to:

T.      Find that Defendants are jointly and severally liable (subject to a right of

equitable apportionment among them) for the harm and damage to the WPHA's Property caused

by Defendants' breach of their duty to take reasonable actions to prevent, investigate, abate, and

otherwise respond to the contamination migrating from the former Getty Station and affecting

the WPHA's Property;

U.      Award the WPHA damages as appropriate for the harm and damage to the

WPHA's Property caused by Defendants' breach of their duty to take reasonable actions to

prevent, investigate, abate, and otherwise respond to the contamination migrating from the former Getty Station and affecting the WPHA's Property;

V.     Award the WPHA punitive damages for the egregious damage to the WPHA's Property caused by Defendants' wanton and willful or reckless disregard for the WPHA's rights as the adjacent property owner; and

W.     Require Defendants to implement an appropriate abatement plan for actual and threatened releases at or from the former Getty Station and migrating onto the WPHA's Property, to compensate the WPHA for abatement measures required on the WPHA's Property, and to restore the WPHA's Property, as expeditiously as practicable, to the condition it was in prior to the contamination migrating from the former Getty Station including without limitation by the safe and effective treatment of all contaminated groundwater on its property to fully achieve New York water quality standards, the excavation and removal of all soils contaminated by the discharge, and the restoration of all above ground facilities and appurtenances including the parking lot surface, walkways, shrubbery and other appurtenances impacted by the excavation of the contaminated soils.

## All Counts

On all counts, Plaintiff asks this Court to:

X.     Retain continuing jurisdiction of this action to the extent necessary and for as long as necessary to enforce and interpret, and to review Defendants' compliance with, this Court's orders;

Y.     Award Plaintiff's attorneys' fees and costs consistent with applicable law; and

Z.     Grant Plaintiff such other and further relief as the Court deems just and proper.

## REQUEST FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff respectfully requests that this

matter be tried by jury.

DATED this 21 day of January, 2014.

Respectfully submitted,

Norman W. Bernstein, Attorney No. NB5123
Inga Caldwell, Attorney No. IC1109

N.W. Bernstein & Associates, LLC
800 Westchester Avenue, Suite N319
Rye Brook, New York 10573
Telephone Number: (914) 358-3500
Facsimile Number: (914) 701-0707

Attorneys for Plaintiff



Former Getty Station — 26 East Post Road — White Plains, Westchester, New York — Benzene Concentration Isopleth 07/13/2011 — Figure 1



FORMER GETTY STATION
26 EAST POST ROAD

WHITE PLAINS,   WESTCHESTER   NEW YORK

BENZENE CONCENTRATION ISOPLETH
10/22/2013

FIGURE 2

FIRST
ENVIRONMENT

BOONTON   NEW JERSEY