# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WHITE PLAINS HOUSING AUTHORITY<br><br>Plaintiff,<br><br>-against-<br><br>GETTY PROPERTIES CORPORATION,<br>TYREE ENVIRONMENTAL<br>CORPORATION,<br>SINGER REAL ESTATE GROUP, LLC,<br>MICHAEL C. KENNY,<br>KENNETH C. SEUS, and<br>MARIANINA OIL CORP.<br><br>Defendants. | Case No. 13-CV-6282 (NSR) |
| GETTY PROPERTIES CORPORATION,<br>TYREE ENVIRONMENTAL<br>CORPORATION,<br>MICHAEL C. KENNY, and KENNETH C.<br>SEUS,<br><br>Third-Party Plaintiffs,<br><br>-against-<br><br>MARIANINA OIL CORP.<br><br>Third-Party Defendant. | **THIRD AMENDED COMPLAINT** |

Plaintiff, the White Plains Housing Authority ("Plaintiff" or "WPHA"), for its Third

Amended Complaint against Defendants Getty Properties Corporation, Tyree Environmental

Corporation, Singer Real Estate Group LLC, Michael C. Kenny, Kenneth C. Seus (collectively,

the "Getty Station Defendants"), and Marianina Oil Corp. ("BP Station Defendant Marianina"),

states and alleges as follows:

## NATURE OF THE ACTION

1.      This is a civil action brought by Plaintiff pursuant to the Resource Conservation

and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq.; New York State Navigation Law, N.Y.

Nav. Law § 181(5); and state law regarding private nuisance, trespass, and negligence, seeking

declaratory relief, injunctive relief, damages, and attorneys' fees and costs for Defendants'

contamination of Plaintiff's real property located at and in the vicinity of 159 South Lexington

Ave., 135 S. Lexington Avenue, 11 Fisher Court, 33 Fisher Court, and 225 Dr. Martin Luther

King Jr. Blvd., White Plains, New York.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of Counts I and II pursuant to

§ 7002(a) of RCRA, 42 U.S.C. § 6972(a); and federal question jurisdiction, 28 U.S.C. § 1331.

3.      This Court has supplemental jurisdiction over Counts III, IV, V, VI, VII, VIII,

and IX under 28 U.S.C. § 1367 because the New York State Navigation Law claim, and the state

law private nuisance, trespass, and negligence claims are so related to the federal claims in this

action that they form the same case and controversy under Article III of the United States

Constitution.

4.      Venue is proper in the Southern District of New York pursuant to 42 U.S.C.

§ 9613(b); 42 U.S.C. § 6972(a); and 28 U.S.C § 1391(b) because the actual and threatened

endangerments, releases, injuries, and damages at issue are taking place and have taken place in

this district.

5.    On or about January 9, 2013, Plaintiff, in a Notice of Endangerment, provided notice of the actual and threatened endangerments, releases, injuries, and damages alleged herein to: (1) the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus; (2) the Administrator of the Environmental Protection Agency ("EPA"); and (3) the State of New York.  Plaintiff's Notice of Endangerment complies with § 7002(b)(2)(A) of RCRA, 42 U.S.C. § 6972(b)(2)(A), and 40 C.F.R. part 254.

6.    Plaintiff waited at least ninety (90) days after receipt of Plaintiff's Notice of Endangerment by the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus, EPA, and the State of New York before filing this action against the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus.

7.    On or about April 15, 2015, Plaintiff, in a Notice of Endangerment, provided notice of the actual and threatened endangerments, releases, injuries, and damages alleged herein to: (1) BP Station Defendant Marianina, (2) the Administrator of the EPA; and (3) the State of New York.  Plaintiff's Notice of Endangerment complies with § 7002(b)(2)(A) of RCRA, 42 U.S.C. § 6972(b)(2)(A), and 40 C.F.R. part 254.

8.    Plaintiff waited at least ninety (90) days after receipt of Plaintiff's Notice of Endangerment by BP Station Defendant Marianina, EPA, and the State of New York before filing this action against BP Station Defendant Marianina.

## THE PARTIES

9.    Plaintiff is a municipal housing authority, existing under the laws of the State of New York.

3

10.     Plaintiff owns and operates a five apartment building multifamily residential public housing known as Winbrook Apartments located in downtown White Plains, New York. ("WPHA's Property" or "Property").

11.     The addresses of Plaintiff's five current Winbrook apartment buildings are 159 S. Lexington Avenue ("Building 159"), 135 S. Lexington Avenue, 11 Fisher Court, 33 Fisher Court ("Building 33"), and 225 Dr. Martin Luther King Jr. Blvd.

12.     Defendant Getty Properties Corporation ("Defendant Getty" or "Getty") is a corporation organized and existing under the laws of the State of Delaware and is doing business in the State of New York.

13.     Defendant Getty operated a retail gasoline filling station, Getty Station No. 00369 at 26 East Post Road, White Plains, New York (the "former Getty Station"), which is adjacent to the WPHA's Property.

14.     Defendant Getty operated the former Getty Station from approximately 1973 until in or about 1988, during which period gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, were released into the environment at and from the former Getty Station.

15.     Defendant Tyree Environmental Corporation ("Tyree") is a corporation organized and existing under the laws of the State of Delaware and is doing business in the State of New York.

16.     Defendant Tyree operated treatment systems at the former Getty Station from 2001 until in or about 2009, during which period gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, released into the environment at and

from the former Getty Station continued to migrate from the former Getty Station and its treatment systems onto the Plaintiff's adjacent property.

17.    Defendant Singer Real Estate Group LLC ("Singer") is a limited liability company organized and existing under the laws of the State of New York.

18.    Defendant Singer acquired the former Getty Station property in or about February 2011 and is the current owner of the former Getty Station property.

19.    During Singer's ownership of the former Getty Station property, gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, continue to migrate from the former Getty Station onto the Plaintiff's adjacent property.

20.    Defendant Michael C. Kenny is a resident of the State of Vermont.

21.    Defendant Michael C. Kenny owned the former Getty Station from 1994 until 2011, during which period gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, migrated from the former Getty Station onto the Plaintiff's adjacent property.

22.    Defendant Kenneth C. Seus is a resident of the State of Massachusetts.

23.    Defendant Kenneth C. Seus owned the former Getty Station from 2005 until 2011, during which period gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, migrated from the former Getty Station onto the Plaintiff's adjacent property.

24.    During the period April 13, 2005 to February 8, 2011, Defendants Michael C. Kenny and Kenneth C. Seus co-owned the former Getty Station.

25.    Defendant Marianina Oil Corp. is a domestic corporation organized and existing under the laws of the State of New York.

26.     BP Station Defendant Marianina is, and has been since in or about 1987, the

owner and operator of a gasoline station located at 34 East Post Road, White Plains, New York

(the "BP Station").

27.     The BP Station is located to the southeast of Plaintiff's Property.

28.     During BP Station Defendant Marianina's ownership of the BP Station, gasoline

and its breakdown products, including benzene and other solid wastes and hazardous substances,

continue to migrate from the BP Station onto the Plaintiff's adjacent property.

## FACTS

### Contamination of the White Plains Housing Authority's Property From the Former Getty Station

29.     Building 159 and its parking lot are adjacent to the former Getty Station.

30.     Approximately 350 people, including children and elderly people, live in

Plaintiff's Building 159.

31.     As of July 2011 or earlier, gasoline and its breakdown products, including

benzene and other solid wastes and hazardous substances, released at and from the former Getty

Station had migrated under Building 159's parking lot, which is directly adjacent to the former

Getty Station, in the general direction of Building 159 itself.

32.     On information and belief, as of October 2013, a portion of the plume of

contamination from the former Getty Station has migrated under one wing of Building 159.

33.     The gasoline and its breakdown products, including benzene and other solid

wastes and hazardous substances, released at and from the former Getty Station include benzene

and other volatile organic compounds.

34.     Benzene is classified by the EPA as a known human carcinogen.

35.     In or about 2001, Getty retained Tyree, an environmental firm, in connection with the contamination at the former Getty Station property.

36.     According to Tyree, groundwater underlying the former Getty Station travels in a north and northwesterly direction from the former Getty Station.

37.     The WPHA's Property, particularly Building 159, is in the direction of the groundwater plume.

38.     The discharge of contamination at the former Getty Station itself was initially reported to the New York Department of Environmental Conservation ("NYDEC") in or about February 1998 and in 2000 Getty obtained consent from Plaintiff to periodically conduct monitoring in the parking lot adjacent to the former Getty Station.

39.     On information and belief, from August 2001 to April 2007, Tyree operated a dual phase high vacuum extraction system at the former Getty Station property.

40.     On information and belief, in April 2007, Tyree deliberately and intentionally terminated the dual phase high vacuum extraction system at the former Getty Station property and substituted a less effective enhanced vapor/fluid recovery "program".

41.     On information and belief, that "program" consisted of only monthly ineffective attempts to have a portable system vacuum up contamination, and even that minimal effort was terminated by Tyree in 2009.

42.     On information and belief, Getty knew and approved of the cost saving steps referenced in paragraphs 40 and 41 above.

43.     In or about February 2011, Singer acquired the contaminated former Getty Station knowing that it had been contaminated.

44.     WPHA's Building 159 and its parking lot are in plain view of the property Singer was acquiring. Accordingly, on information and belief, Singer also knew that Plaintiff's Building 159 and its parking lot were immediately adjacent to the former Getty Station.

45.     Beginning late in 2011, WPHA was contacted by Tyree, on behalf of Getty, to obtain WPHA's consent to conduct a test of a chemical process known as ozone injection in the Plaintiff's parking lot located between the former Getty Station and Building 159.

46.     In May 2012, Tyree provided WPHA with a September 2011 monitoring report that summarized its operations at the former Getty Station.

47.     The September 2011 Tyree monitoring report also included samples taken on the WPHA's Property in July 2011, including at two monitoring wells, MW-101 and GP-19.

48.     The September 2011 Tyree monitoring report and the Tyree ozone injection work plan both contained maps that included Plaintiff's parking lot, labeled as the "Winbrook Apts. Parking Area", but omitted Building 159, which is located immediately on the other side of the parking lot and also failed to show the proximity of the contamination and proposed ozone injection points to Building 159.

49.     Building 159 is in fact located approximately 70 feet west northwest from Getty monitoring well MW-101 and approximately 100 feet northwest of monitoring well GP-19.

50.     The September 2011 Tyree monitoring report of July groundwater results showed that in July 2011, benzene in MW-101 was 224 ppb (parts per billion) and in GP-19 was 708 ppb, both of which monitoring wells are located on the WPHA's property.

51.     The NYDEC acceptable water quality standard for benzene is 1 ppb. 6 NYCRR § 703.5, Table 1.

52.     Similarly, in MW-101 ethyl-benzene was 1,610 ppb and toluene was 136 ppb and in GP-19 ethyl-benzene was 764 ppb and toluene was 144 ppb.

53.     The NYDEC acceptable water quality standards for ethyl-benzene and toluene are 5 ppb.  6 NYCRR § 703.5, Table 1.

54.     The September 2011 Tyree Report also included sampling data taken on the WPHA's Property going back to July 2010.

55.     On information and belief, prior to in or about May 2012 Tyree did not supply to WPHA any sampling data taken on the WPHA's Property.

56.     The ozone injection process referenced in paragraph 45 above, that Tyree sought to employ in the WPHA's parking lot is a chemical process that can be used to destroy certain contaminants but it does so through a chemical reaction that can itself generate fumes that can enter a nearby structure through underground conduits, such as ducts and pipes.

57.     There are underground conduits, such as ducts and pipes that enter Building 159.

58.     Tyree asserted that the NYDEC had consented to the ozone injection.

59.     Plaintiff objected to the NYDEC that the proposed injection locations were in close proximity to Building 159, which was not even shown on the September 2011 Tyree monitoring report or ozone injection work plan, that the full extent of the plume of contamination had not been characterized, and that under good environmental practice a remedy should not be tested or undertaken until the full extent of the plume is known.

60.     Plaintiff requested that Tyree be directed to delineate the entire Getty Station plume, including the north and northwest portion of the plume in the direction of Building 159, and be directed to revise all of its maps to include Plaintiff's Building 159 and the immediately surrounding area.

61.     Thereafter, in March 2013, Tyree, on behalf of Getty, submitted to the NYDEC a revised work plan that called for additional testing of the extent of the plume on the WPHA's Property, did not involve ozone injection, and for the first time showed the location of Building 159.

62.     In March 2013, a conference call was held among the NYDEC, environmental consultants to Plaintiff, and counsel for the Plaintiff, Tyree and Getty.  As a result, all remaining differences as to the scope of the work plan appeared to have been resolved.

63.     Getty, however, did not cause Tyree to implement the March 2013 work plan, but in August 2013 asserted for the first time through its counsel that it had not received NYDEC approval for the March 2013 work plan.  When notified of that fact, the NYDEC promptly approved the work plan.

64.     In October 8-10, 2013, Tyree on behalf of Getty oversaw the implementation of the March 2013 work plan to investigate the further extent of the contamination migrating from the former Getty Station property onto the WPHA's Property.  Additional monitoring wells were installed, and soil and groundwater samples taken.

65.     Duplicate samples were taken on behalf of Plaintiff by its environmental consulting firm, First Environment.

66.     Because Tyree had not sampled MW-101, First Environment also sampled that well separately later in October 2013.

67.     In November 2013, Tyree filed a report with the NYDEC of the October 2013 sampling.

68.     The November 2013 Tyree report failed to contain a map of the plume from the former Getty Station.

69.     Additionally, the November 2013 Tyree report had numerous other deficiencies, including that it: failed to mention that certain soil borings and monitoring wells were on the WPHA's Property; failed to mention that all but two of the permanently installed monitoring wells on the WPHA's Property contained benzene above NYDEC cleanup criteria; suggested that the high concentrations of contaminated soils under the WPHA's Property did not need to be remediated; failed to provide any modeling showing how far and at what concentrations the plume can be expected to travel; failed to adequately delineate the full extent of soil and groundwater contamination on the WPHA's Property and failed to mention or address the potential for vapor intrusion into the WPHA's Building 159.

70.     On December 30, 2013, First Environment provided a Report of its sampling data and a detailed critique of the November 2013 Tyree report documenting the above and other deficiencies.

71.     Figure 1 of First Environment's December 2013 Report showed the extent of the benzene plume from the former Getty Station based on the July 2011 data, and Figure 2 of First Environment's Report showed the extent of the benzene plume from the former Getty Station in October 2013. (Copies of Figures 1 and 2 are attached to this Third Amended Complaint.)

72.     According to First Environment, Figure 1 showed that in July 2011 the benzene plume from the former Getty Station was continuing to migrate off of the former Getty Station toward and onto the WPHA's Property.

73.     According to First Environment, Figure 2 showed that, as of October 2013, the benzene plume has continued to migrate past the Building 159 parking lot, that the shape of the plume is incomplete due to a lack of sampling results, and that First Environment could conclude from Figure 2 that the leading edge of the benzene plume equal to or above the NYDEC standard

had already migrated underneath one wing of Building 159 and that it continues to spread toward the basketball courts area and beyond on the WPHA's Property.

74.     Without limiting the foregoing, in October 2013, a newly installed well in the Building 159 parking lot, MW-107, had 475 ppb benzene in groundwater; a newly installed well within about 10 feet from Building 159, MW-103, had 7.3 ppb benzene in groundwater; and a well alongside Building 159 next to a walkway, MW-104, had 4.2 ppb benzene in groundwater. All of those monitoring wells are on the WPHA's Property.

75.     MW-104 is less than 10 feet from a water line that enters Building 159's basement. The data also showed that benzene had spread to the far side of basketball courts that are opposite Building 159.

76.     When MW-107 was installed in October 2013, soil samples were also taken beneath the asphalt covering the Building 159 parking lot. Those samples showed that at a depth of 4' to 5' the soil under the parking lot contained 331 ppb benzene and at 5' to 6' the soil contained 472 ppb benzene.

77.     On information and belief, the benzene and other contamination found in the soil under the Building 159 parking lot is due to the groundwater plume migrating from the former Getty Station.

78.     The Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer: failed to take proper precautions to ensure that the treatment of gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, released at and from the former Getty Station was done in a manner that would prevent migration of the contamination onto the WPHA's Property; failed to delineate the extent of the plume of contamination on the WPHA's Property; failed to delineate the extent of

soil contamination on the WPHA's Property; and failed until 2013 to even show the presence of Building 159 on maps submitted to the NYDEC.

79.     At all times relevant to this Third Amended Complaint, Building 159 was and is in plain view of anyone conducting environmental remediation on the former Getty Station property.

80.     The Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer thus were aware at all relevant times that the former Getty Station was adjacent to the WPHA's Property, including Building 159, and that Plaintiff's tenants occupied Building 159.

81.     The gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, released at and from the former Getty Station have migrated and continue to migrate through the environment, including without limitation in the groundwater moving onto the WPHA's Property and may present an imminent and substantial endangerment to human health and the environment.

82.     Plaintiff has begun a long-term project estimated to cost in the range of $350 million to replace the five existing buildings on the WPHA's Property, including Building 159, with new, modern, energy efficient buildings without displacing from the complex any of the existing tenants.

83.     On information and belief, the presence of soil contamination and groundwater contamination from the BP Station on the WPHA's Property will prevent or materially interfere with and/or increase the cost and complexity of the financing for construction of this project in the vicinity of Building 159, and may adversely impact the financing for construction of other buildings and amenities to be constructed on the WPHA's Property.

84.     On information and belief, the contamination on the WPHA's Property may also pose an imminent and substantial endangerment to the construction workers who will need to excavate contaminated soils or who will come into contact with contaminated groundwater in the vicinity of Building 159.

85.     Plaintiff has not consented to any contamination remaining on its Property.

**Contamination from the Former Getty Station has Damaged Plaintiff**

86.     Plaintiff has incurred and will continue to incur costs in responding to the contamination and potential risk from the contamination migrating from the former Getty Station onto the WPHA's Property.

87.     Plaintiff's costs have and will include costs of an environmental consulting firm to review and evaluate: data regarding contamination migrating onto the WPHA's Property from the former Getty Station; Tyree's proposed pilot ozone injection work plan; Tyree's March 2013 subsurface investigation work plan; Tyree's implementation of that work plan in October 2013; and to provide comments on Tyree's report of the data collected in October 2013.

88.     The environmental consulting firm retained by WPHA has also from time to time conducted sampling at the WPHA's property.

89.     Plaintiff has and will continue to incur attorneys' fees.

90.     Financing for the construction referred to in paragraphs 82 through 84 of this Third Amended Complaint in the vicinity of Building 159 will in significant part be dependent on approvals, grants and/or other funding from the United States Housing and Urban Development Agency ("HUD"), the New York State Housing Finance Agency ("HFA"), as well as from other state and local governmental agencies.

91.     HUD regulations prohibit any proposed development of contaminated properties and require an environmental review for all projects involving five or more dwelling units. 24 CFR §58.5(i)(2).

92.     In August 2013, the Office of the Comptroller of the Currency warned banks against lending on environmentally contaminated property and that: "Contamination may decrease the collateral's value or render the collateral worthless." U.S. Department of the Treasury, Office of the Comptroller of the Currency, Comptroller's Handbook: Commercial Real Estate Lending, August 2013.

93.     On information and belief, the combination of the contamination from the former Getty Station on the WPHA's Property, and limitations on the ability of the WPHA to obtain HUD approvals and/or financing because of that contamination, may deter and/or prevent other state and local governmental agencies from providing financing and/or increase the cost, complexity, and burdens of such financing.

94.     Similarly, financing from banks and real estate developers may also be prevented or made more complex and costly because of the contamination on the WPHA's Property from the former Getty Station.

95.     In summary, on information and belief, the contamination migrating from the former Getty Station, in addition to presenting a potentially imminent and substantial endangerment to human health and the environment, may prevent and/or increase the cost, complexity and burdens of financing for new construction in the vicinity of what is now Building 159 and its adjacent areas to which the contamination from the former Getty Station has spread unless all of that contamination is fully remediated.

96.     Plaintiff did not cause or contribute to the contamination that has harmed the value of its Property.

97.     Plaintiff seeks immediate remediation of all of the contamination migrating to its property in the vicinity of Plaintiff's Building 159 and its adjacent areas in order to eliminate the potential threats to human health and the environment and to abate the damage to its financing of replacement of its buildings as aforesaid.

98.     Plaintiff also seeks monetary damages for the costs that Plaintiff has incurred and will incur responding to the contamination migrating from the former Getty Station, damages for the interference with the financing of its replacement of Building 159 and construction of other buildings and amenities on its Property, and the cost of restoring its Property to the condition it was in prior to the contamination migrating from the former Getty Station.

99.     The Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus' and Getty Station Defendant Singer's activities involved the use of gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, that, when released, are harmful to human health, the environment and real property value.  Under applicable federal and state law, the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer, as set forth below, are strictly liable, jointly and severally, for all costs and damage caused by their releases of gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, and for the abatement of the risks and damages associated with the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus' and Getty Station Defendant Singer's activities.

100.    By their continuing failure to act to address this situation properly and promptly and in a reasonable manner, the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and

Kenneth C. Seus and Getty Station Defendant Singer have allowed contamination to migrate from the former Getty Station onto the WPHA's Property, which has caused damage, and continues to cause damage to the WPHA's Property and to the WPHA.

**Contamination of the White Plains Housing Authority's Property**
**From the BP Station During Marianina's Ownership and Operation of the BP Station**

101.    WPHA's Building 33 and its parking lot are adjacent to the BP Station.

102.    On August 17, 1994, a spill of gasoline at the BP Station was reported to the NYDEC, Spill Number 94-06684.

103.    On June 30, 1999, Spill Number 94-06684 was closed by the NYDEC.

104.    On March 18, 1996, a spill of five gallons of diesel at the BP Station was reported to the NYDEC, Spill Number 95-16188.

105.    On November 12, 1997, Spill Number 95-16188 was closed by the NYDEC.

105.A. BP Station Defendant Marianina did not disclose to the Plaintiff the existence of those spills.

106.    On or about September 19, 2014, Tyree installed two temporary monitoring wells, MW-110 and MW-111, in the sidewalk immediately adjacent to the BP Station.

107.    On or about September 19, 2014, First Environment and Tyree took split samples of the soil and groundwater at MW-110 and MW-111.

108.    The September 2014 soil sample results for MW-110 included 280 ppb benzene and 79,000 ppb 1,2,4-Trimethylbenzene.

109.    The MW-110 soil sample results exceeded NYDEC CP-51 soil cleanup levels.

110.    The September 2014 groundwater results for MW-110 included 240 ppb benzene and 3,900 ppb 1,2,4-Trimethylbenzene.

111.    The September 2014 groundwater results for MW-111 included 1,400 ppb benzene and 83 ppb 1,2,4-Trimethylbenzene.

112.    In April 2015, First Environment installed six temporary monitoring wells, including TWB-2 and TWB-5, to the north and/or northwest of the BP Station and sampled existing MW-106.

113.    Temporary monitoring well TWB-2 is approximately 125 feet from Building 33.

114.    Temporary monitoring well TWB-5 is approximately 90 feet from Building 33.

115.    The April 2015 soil sample results for TWB-2 included 33,000 ppb 1,2,4-Trimethylbenzene and 2,100 ppb xylenes (total).

116.    The April 2015 soil sample results for TWB-5 included 23,000 ppb 1,2,4-Trimethylbenzene and 9,700 ppb xylenes (total).

117.    The April 2015 TWB-2 and TWB-5 soil sample results exceeded NYDEC CP-51 soil cleanup levels.

118.    The April 2015 groundwater results for TWB-2 included 30 ppb benzene, 2,600 ppb 1,2,4-Trimethylbenzene, and 3,300 ppb xylenes (total).

119.    The April 2015 groundwater results for TWB-5 included 2,900 ppb 1,2,4-Trimethylbenzene and 6,080 ppb xylenes (total).

119.A. The NYDEC acceptable water quality standards are as follows: benzene, 1 ppb; 1,2,4-Trimethylbenzene, 5 ppb; 1,3,5-Trimethylbenzene, 5 ppb; ethylbenzene, 5 ppb; and m&p-xylenes, 5 ppb.  6 NYCRR § 703.5, Table 1.

120.    Benzene is classified by the EPA as a known human carcinogen.

121.    In addition to TWB-2 and TWB-5, the April 2015 groundwater results for TWB-3, TWB-4, and TWB-6 exceeded the NYDEC acceptable water quality standards, including for 1,2,4-Trimethylbenzene, 1,3,5-Trimethylbenzene, ethylbenzene, and m&p-xylenes.

122.    On information and belief, groundwater flow direction in the vicinity of the BP Station is to the north and/or northwest direction.

123.    On information and belief, a portion of Plaintiff's property is downgradient of the BP Station.

124.    On information and belief, the benzene and other contamination found in the soil in the vicinity of Building 33 is due to the groundwater plume migrating from the BP Station.

125.    BP Station Defendant Marianina failed to take proper precautions to prevent the migration of the gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, released at and from the BP Station onto the WPHA's Property.

126.    The gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, released at and from the BP Station have migrated and continue to migrate through the environment, including without limitation in the groundwater moving onto the WPHA's Property and may present an imminent and substantial endangerment to human health and the environment.

127.    Plaintiff has begun a long-term project estimated to cost in the range of $350 million to replace the five existing buildings on the WPHA's Property, including Building 33, with new, modern, energy efficient buildings without displacing from the complex any of the existing tenants.

128.    On information and belief, the presence of soil contamination and groundwater contamination from the BP Station on the WPHA's Property will prevent or materially interfere

with and/or increase the cost and complexity of the financing for construction of this project in the vicinity of Building 33, and may adversely impact the financing for construction of other buildings and amenities to be constructed on the WPHA's Property.

129.     On information and belief, the contamination on the WPHA's Property may also pose an imminent and substantial endangerment to the construction workers who will need to excavate contaminated soils or who will come into contact with contaminated groundwater in the vicinity of Building 33.

130.     Plaintiff has not consented to any contamination remaining on its Property.

**Contamination from the BP Station During Marianina's Ownership and Operation of the BP Station has Damaged Plaintiff**

131.     Plaintiff has incurred and will continue to incur costs in responding to the contamination and potential risk from the contamination migrating from the BP Station onto the WPHA's Property.

132.     Plaintiff's costs have and will include costs of an environmental consulting firm to review and evaluate data regarding contamination migrating onto the WPHA's Property from the BP Station and appropriate remedies.

133.     The environmental consulting firm retained by WPHA has also conducted sampling at the WPHA's Property and may do so in the future.

134.     Plaintiff has and will continue to incur attorneys' fees.

135.     Financing for the construction referred to in paragraphs 127 through 129 of this Third Amended Complaint in the vicinity of Building 33 will in significant part be dependent on approvals, grants and/or other funding from the United States Housing and Urban Development Agency ("HUD"), the New York State Housing Finance Agency ("HFA"), as well as from other state and local governmental agencies.

136.     HUD regulations prohibit any proposed development of contaminated properties and require an environmental review for all projects involving five or more dwelling units. 24 CFR §58.5(i)(2).

137.     In August 2013, the Office of the Comptroller of the Currency warned banks against lending on environmentally contaminated property and that: "Contamination may decrease the collateral's value or render the collateral worthless." U.S. Department of the Treasury, Office of the Comptroller of the Currency, Comptroller's Handbook: Commercial Real Estate Lending, August 2013.

138.     On information and belief, the combination of the contamination from the BP Station on the WPHA's Property, and limitations on the ability of the WPHA to obtain HUD approvals and/or financing because of that contamination, may deter and/or prevent other state and local governmental agencies from providing financing and/or increase the cost, complexity, and burdens of such financing.

139.     Similarly, financing from banks and real estate developers may also be prevented or made more complex and costly because of the contamination on the WPHA's Property from the BP Station.

140.     In summary, on information and belief, the contamination migrating from the BP Station, in addition to presenting a potentially imminent and substantial endangerment to human health and the environment, may prevent and/or increase the cost, complexity and burdens of financing for new construction in the vicinity of what is now Building 33 and its adjacent areas to which the contamination from the BP Station has spread unless all of that contamination is fully remediated.

141.    Plaintiff did not cause or contribute to the contamination that has harmed the value of its Property.

142.    Plaintiff seeks immediate remediation of all of the contamination migrating to its property in the vicinity of Plaintiff's Building 33 and its adjacent areas in order to eliminate the potential threats to human health and the environment and to abate the damage to its financing of replacement of its buildings as aforesaid.

143.    Plaintiff also seeks monetary damages for the costs that Plaintiff has incurred and will incur responding to the contamination migrating from the BP Station, damages for the interference with the financing of its replacement of Building 33 and construction of other buildings and amenities on its Property, and the cost of restoring its Property to the condition it was in prior to the contamination migrating from the BP Station.

144.    BP Station Defendant Marianina's activities involved the use of gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, that, when released, are harmful to human health, the environment and real property value.  Under applicable federal and state law, BP Station Defendant Marianina, as set forth below, is strictly liable for all costs and damage caused by the BP Station Defendant Marianina's releases of gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, and for the abatement of the risks and damages associated with BP Station Defendant Marianina's activities.

145.    By its continuing failure to act to address this situation properly and promptly and in a reasonable manner, BP Station Defendant Marianina has allowed contamination to migrate from the BP Station onto the WPHA's Property, which has caused damage, and continues to cause damage to the WPHA's Property and to the WPHA.

## CLAIMS FOR RELIEF

### Count I – Against the Getty Station Defendants Getty, Tyree,
### Michael C. Kenny, and Kenneth C. Seus
### RCRA 42 U.S.C. § 6972

146.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 100 of this Third Amended Complaint.

147.   Section 7002(a)(1)(B) of RCRA, under which Plaintiff brings this Count I, authorizes "any person" to bring a lawsuit when: (1) "solid or hazardous waste"; (2) "may present an imminent and substantial endangerment to health or the environment"; and (3) the defendant falls within one of the categories of entities that Congress made liable for taking abatement action. 42 U.S.C. § 6972(a)(1)(B).

148.   The persons declared liable by Congress for potential endangerments under § 7002(a)(1)(B) of RCRA are entities that contributed to "past or present handling, storage, treatment, transportation, or disposal" of the solid or hazardous waste at issue.  These entities include "any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility." 42 U.S.C. § 6972(a)(1)(B).

149.   Under § 1004(27) of RCRA, subject to limitations not applicable to this case, the term "'solid waste' means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities…." 42 U.S.C. § 6903(27).

150.   Under § 1004(5) of RCRA, the term "'hazardous waste' means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—(A) cause, or significantly contribute to an increase in

mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5).

151.    The administrative regulations promulgated under RCRA contain additional definitions of solid and hazardous waste. 40 C.F.R. Part 261.  However, for purposes of RCRA § 7002(a)(1)(B) citizen suits, the statutory definitions of solid and hazardous waste, set forth in RCRA §§ 1004(27) and (5), apply. 40 C.F.R. § 261.1(b)(2).

152.    The substances released at and from the former Getty Station that have migrated onto the WPHA's Property meet the definitions of "solid waste" and "hazardous waste".

153.    Tyree is a person covered under § 7002(a)(1)(B) of RCRA as an operator of a treatment facility whose acts and omissions caused and contributed to, and continue to cause and contribute to the past or present handling, storage, treatment, transportation, or disposal of solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

154.    Getty oversees Tyree's work at the former Getty Station under arrangements known to Getty and Tyree but not known to Plaintiff.

155.    Getty is a person covered under § 7002(a)(1)(B) of RCRA as a generator and as an operator of a treatment facility whose acts and omissions caused and contributed to, and continue to cause and contribute to the past or present handling, storage, treatment, transportation, or disposal of solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

156.    Michael C. Kenny is a person covered under § 7002(a)(1)(B) of RCRA as a past owner of property whose acts and omissions caused and contributed to, and continue to cause

and contribute to the past or present handling, storage, treatment, transportation, or disposal of solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

157.    Kenneth C. Seus is a person covered under § 7002(a)(1)(B) of RCRA as a past owner of property whose acts and omissions caused and contributed to, and continue to cause and contribute to the past or present handling, storage, treatment, transportation, or disposal of solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

158.    Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus have not stopped or prevented the potential endangerments and the actual and threatened injuries and damage at issue are ongoing and will persist until enjoined by this Court.

159.    Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus are liable under § 7002(a) of RCRA and that liability is strict, and joint and several.

160.    Unless abated by order of this Court, the endangerments complained of may cause irreparable injury to Plaintiff.

161.    Unless abated by order of this Court, the endangerments complained of may cause irreparable injury to human health and the environment at, around, and in the vicinity of the WPHA's Property.

162.    On information and belief, neither EPA nor the State of New York has commenced or is diligently prosecuting an action under RCRA § 7003, 42 U.S.C. § 6973, or CERCLA § 106, 42 U.S.C. § 9606, to abate the endangerments at issue.

163.    Neither EPA nor the State of New York is actually engaging in a removal action under CERCLA § 104, 42 U.S.C. § 9604, to abate the endangerments at issue.

164.    Neither EPA nor the State of New York has incurred costs to initiate a Remedial Investigation and Feasibility Study under CERCLA § 104, 42 U.S.C. § 9604, or is diligently proceeding with a remedial action under CERCLA to abate the endangerments at issue.

165.    No responsible party is diligently conducting a removal action, Remedial Investigation and Feasibility Study, or proceeding with a remedial action pursuant to a judicial or administrative order obtained by EPA under RCRA § 7003, 42 U.S.C. § 6973, or CERCLA § 106, 42 U.S.C. § 9606, to abate the endangerments at issue.

166.    Without limiting the foregoing, in response to Freedom of Information Law requests for copies of all writings pertaining to the former Getty Station, although the NYDEC assigned a spill number to the former Getty Station site in 1997 (Spill Number 97-13110) and although Tyree's September 2011 Report shows that beginning in 1998 Tyree had been installing monitoring wells and collecting data at the former Getty Station site, which it was required under NY law to report to NYDEC, the NYDEC case manager has not produced many of the key records of this site, including, but not limited to: (i) the NYDEC's approval in April of 2001 of the location of off-site monitoring wells, (ii) the NYDEC's approval in 2007 of Tyree Company's March 27, 2007 request to turn off the Dual Phase High Vacuum Extraction System and to substitute twice monthly visits by a Vac Truck, (iii) the NYDEC's approval of the reduction of the reduction to one visit a month visits by the Vac Truck mounted vacuum recovery system, and (iv) the NYDEC's approval late in 2009 of the discontinuance of the Vac Truck.

167.    According to the September 2011 Tyree monitoring report, the NYDEC permitted the shutdown of the dual phase high vacuum extraction system at the former Getty Station in April of 2007.

168.    According to the September 2011 Tyree monitoring report, the NYDEC permitted

Tyree to substitute an enhanced vapor/fluid recovery monthly program (meaning a monthly

effort to use a truck mounted vacuum system to try to remove some of the contaminated vapor

and fluids from some of the wells).

169.    According to the September 2011 Tyree monitoring report, the NYDEC allowed

the enhanced vapor/fluid recovery monthly program to be discontinued at the end of 2009.

170.    On information and belief, contamination remains on the former Getty Station and

continues to migrate onto the WPHA's Property.

171.    Plaintiff has served a copy of this Third Amended Complaint on the Attorney

General of the United States and on EPA.

172.    Plaintiff is entitled to relief under § 7002(a) of RCRA, 42 U.S.C. § 6972(a),

restraining Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and

requiring Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus to

take such action as may be necessary to abate the potential endangerments at issue or to pay

Plaintiff the costs thereof.

173.    Plaintiff is also entitled to an order requiring Getty Station Defendants Getty,

Tyree, Michael C. Kenny, and Kenneth C. Seus to pay the Plaintiff's costs of litigation, including

reasonable attorney and expert witness fees.  RCRA § 7002(e), 42 U.S.C. § 6972(e).

## Count II - Against BP Station Defendant Marianina
## RCRA 42 U.S.C. § 6972

174.    Plaintiff incorporates by reference the allegations contained in paragraphs 1

through 28, and 101 through 145, of this Third Amended Complaint.

175.    Section 7002(a)(1)(B) of RCRA, under which Plaintiff brings this Count II,

authorizes "any person" to bring a lawsuit when: (1) "solid or hazardous waste"; (2) "may

present an imminent and substantial endangerment to health or the environment"; and (3) the defendant falls within one of the categories of entities that Congress made liable for taking abatement action. 42 U.S.C. § 6972(a)(1)(B).

176.    The persons declared liable by Congress for potential endangerments under § 7002(a)(1)(B) of RCRA are entities that contributed to "past or present handling, storage, treatment, transportation, or disposal" of the solid or hazardous waste at issue.  These entities include "any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility." 42 U.S.C. § 6972(a)(1)(B).

177.    Under § 1004(27) of RCRA, subject to limitations not applicable to this case, the term "'solid waste' means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities...." 42 U.S.C. § 6903(27).

178.    Under § 1004(5) of RCRA, the term "'hazardous waste' means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5).

179.    The administrative regulations promulgated under RCRA contain additional definitions of solid and hazardous waste. 40 C.F.R. Part 261.  However, for purposes of RCRA § 7002(a)(1)(B) citizen suits, the statutory definitions of solid and hazardous waste, set forth in RCRA §§ 1004(27) and (5), apply. 40 C.F.R. § 261.1(b)(2).

180.    The substances released at and from the BP Station that have migrated onto the WPHA's Property meet the definitions of "solid waste" and "hazardous waste".

181.    BP Station Defendant Marianina is a person covered under § 7002(a)(1)(B) of RCRA as a generator and an owner and operator of a treatment facility whose acts and omissions caused and contributed to, and continue to cause and contribute to the past or present handling, storage, treatment, transportation, or disposal of solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

182.    BP Station Defendant Marianina has not stopped or prevented the potential endangerments and the actual and threatened injuries and damage at issue are ongoing and will persist until enjoined by this Court.

183.    Unless abated by order of this Court, the endangerments complained of may cause irreparable injury to Plaintiff.

184.    Unless abated by order of this Court, the endangerments complained of may cause irreparable injury to human health and the environment at, around, and in the vicinity of the WPHA's Property.

185.    On information and belief, neither EPA nor the State of New York has commenced or is diligently prosecuting an action under RCRA § 7003, 42 U.S.C. § 6973, or CERCLA § 106, 42 U.S.C. § 9606, to abate the endangerments at issue.

186.    On information and belief, neither EPA nor the State of New York is actually engaging in a removal action under CERCLA § 104, 42 U.S.C. § 9604, to abate the endangerments at issue.

187.    On information and belief, neither EPA nor the State of New York has incurred costs to initiate a Remedial Investigation and Feasibility Study under CERCLA § 104, 42 U.S.C.

§ 9604, or is diligently proceeding with a remedial action under CERCLA to abate the endangerments at issue.

188.    On information and belief, no responsible party is diligently conducting a removal action, Remedial Investigation and Feasibility Study, or proceeding with a remedial action pursuant to a judicial or administrative order obtained by EPA under RCRA § 7003, 42 U.S.C. § 6973, or CERCLA § 106, 42 U.S.C. § 9606, to abate the endangerments at issue.

189.    On information and belief, contamination remains on the BP Station and continues to migrate onto the WPHA's Property.

190.    Plaintiff has served a copy of this Third Amended Complaint on the Attorney General of the United States and on EPA.

191.    Plaintiff is entitled to relief under § 7002(a) of RCRA, 42 U.S.C. § 6972(a), restraining BP Station Defendant Marianina and requiring BP Station Defendant Marianina to take such action as may be necessary to abate the potential endangerments at issue or to pay Plaintiff the costs thereof.

192.    Plaintiff is also entitled to an order requiring BP Station Defendant Marianina to pay the Plaintiff's costs of litigation, including reasonable attorney and expert witness fees. RCRA § 7002(e), 42 U.S.C. § 6972(e).

### Count III – Against the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer

### New York State Navigation Law § 181

193.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 100, and 146 through 173, of this Third Amended Complaint.

194.    Under § 181 of the New York State Navigation Law, under which Plaintiff brings this Count III, any person who has discharged petroleum is "strictly liable, without regard to

fault, for all cleanup and removal costs and all direct and indirect damages…." N.Y. Nav. Law § 181(1).

195.    An injured person may bring a strict liability claim directly against any person who has discharged petroleum for the costs of cleanup and removal and direct and indirect damages.  N.Y. Nav. Law § 181(5).

196.    Under § 172(8) of the New York State Navigation Law, the term "'[d]ischarge' means any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of petroleum into the waters of the state or onto lands from which it might flow or drain into said waters, or into waters outside the jurisdiction of the state when damage may result to the lands, waters or natural resources within the jurisdiction of the state". N.Y. Nav. Law § 172(8).

197.    The "waters…within the jurisdiction of the state" include groundwater.  N.Y. Nav. Law § 172(18).

198.    The spill and release of gasoline, among other substances, at the former Getty Station and into the groundwater meets the definition of a "discharge".

199.    Under § 172(15) of the New York State Navigation Law, the term "'[p]etroleum' means oil or petroleum of any kind and in any form including, but not limited to, oil, petroleum, fuel oil, oil sludge, oil refuse, oil mixed with other wastes and crude oils, gasoline and kerosene". N.Y. Nav. Law § 172(15).

200.    The spill and release of gasoline, among other substances, at the former Getty Station meets the definition of spill of "petroleum" under the Navigation Law.

201.    The Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus' and Getty Station Defendant Singer's discharges of gasoline at the former Getty Station

have caused gasoline and its breakdown products to migrate onto the WPHA's Property causing damage to WPHA and to its Property.

202.     The Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer are strictly liable under the New York State Navigation Law as persons who discharged petroleum at and from the former Getty Station causing direct and indirect damages to Plaintiff.

203.     Under applicable case law, that liability is joint and several.

204.     Pursuant to § 181(5) of the New York State Navigation Law, Plaintiff is entitled to an award of cleanup and removal costs and direct and indirect damages, including attorneys' fees that were incurred by Plaintiff as a result of the discharge and migration of the contamination, plus interest.

205.     Pursuant to applicable case law, including *AMCO International, Inc. v. Long Island Railroad Co.*, 754 N.Y.S.2d 655, 657 (N.Y. App. Div. 2003), the WPHA is also entitled to have its Property fully restored to its pre-spill condition.

<u>**Count IV – Against BP Station Defendant Marianina**</u>
<u>**New York State Navigation Law § 181**</u>

206.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 28, 101 through 145, and 174 through 192, of this Third Amended Complaint.

207.     Under § 181 of the New York State Navigation Law, under which Plaintiff brings this Count IV, any person who has discharged petroleum is "strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages…." N.Y. Nav. Law § 181(1).

208.    An injured person may bring a strict liability claim directly against any person who has discharged petroleum for the costs of cleanup and removal and direct and indirect damages.  N.Y. Nav. Law § 181(5).

209.    Under § 172(8) of the New York State Navigation Law, the term "'[d]ischarge' means any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of petroleum into the waters of the state or onto lands from which it might flow or drain into said waters, or into waters outside the jurisdiction of the state when damage may result to the lands, waters or natural resources within the jurisdiction of the state". N.Y. Nav. Law § 172(8).

210.    The "waters…within the jurisdiction of the state" include groundwater.  N.Y. Nav. Law § 172(18).

211.    The spill and release of gasoline, among other substances, at the BP Station and into the groundwater meets the definition of a "discharge".

212.    Under § 172(15) of the New York State Navigation Law, the term "'[p]etroleum' means oil or petroleum of any kind and in any form including, but not limited to, oil, petroleum, fuel oil, oil sludge, oil refuse, oil mixed with other wastes and crude oils, gasoline and kerosene". N.Y. Nav. Law § 172(15).

213.    The spill and release of gasoline, among other substances, at the BP Station meets the definition of spill of "petroleum" under the Navigation Law.

214.    BP Station Defendant Marianina's discharges of gasoline at the BP Station has caused gasoline and its breakdown products to migrate onto the WPHA's Property causing damage to WPHA and to its Property.

215. BP Station Defendant Marianina is strictly liable under the New York State Navigation Law as a person who discharged petroleum at and from the BP Station causing direct and indirect damages to Plaintiff.

216. Pursuant to § 181(5) of the New York State Navigation Law, Plaintiff is entitled to an award of cleanup and removal costs and direct and indirect damages, including attorneys' fees that were incurred by Plaintiff as a result of the discharge and migration of the contamination, plus interest.

217. Pursuant to applicable case law, including *AMCO International, Inc. v. Long Island Railroad Co.*, 754 N.Y.S.2d 655, 657 (N.Y. App. Div. 2003), the WPHA is also entitled to have its Property fully restored to its pre-spill condition.

**Count V – Against the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer Private Nuisance**

218. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 100, 146 through 173, and 193 through 205 of this Third Amended Complaint.

219. Under New York common law, under which Plaintiff brings this Count V, private nuisance "is actionable by the individual person or persons whose rights have been disturbed" when there is "an interference with the use or enjoyment of land". *Copart Industries, Inc. v. Consolidated Edison Co. of New York, Inc.*, 362 N.E.2d 968, 971 (N.Y. 1977).

220. A defendant is liable "for a private nuisance if his conduct is a legal cause of the invasion of interest in the private use and enjoyment of land and such invasion is (1) intentional and unreasonable, (2) negligent or reckless, or (3) actionable under the rules governing liability for abnormally dangerous conditions or activities". *Id.*

221.   "[E]veryone who creates a nuisance or participates in the creation or maintenance of a nuisance are liable jointly and severally for the wrong and injury done thereby." *Schenectady Chemicals, Inc.*, 459 N.Y.S.2d at 976.

222.   Under New York common law, "[e]ven a non-landowner can be liable for taking part in the creation of a nuisance upon the property of another." *Id.* at 977.

223.   Plaintiff WPHA owns the WPHA's Property.

224.   The Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus' and Getty Station Defendant Singer's acts and omissions have interfered with Plaintiff's use and enjoyment of its Property.

225.   The Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer have acted intentionally and unreasonably and/or negligently by failing to contain the sources of contamination and prevent the migration of gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, onto the WPHA's Property.

226.   Plaintiff has suffered, and continues to suffer, damages from the private nuisance.

227.   Unless abated by order of this Court, the private nuisance will continue to cause Plaintiff irreparable injury.

228.   Unless abated by order of this Court, the private nuisance will cause irreparable injury to human health and the environment in, at, around and in the vicinity of the WPHA's Property.

229.   Unless abated by order of this Court, the private nuisance will likely prevent, restrict and/or make more complex HUD approvals and make more costly bank, developer, and other funding.

230.    Unless abated by order of this Court, the private nuisance has and will continue to force Plaintiff to incur costs responding to the contamination and potential risk.

231.    The Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus' and Getty Station Defendant Singer's liability to abate the private nuisance is strict, joint and several.

### Count VI – Against BP Station Defendant Marianina
### Private Nuisance

232.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 28, 101 through 145, 174 through 192, and 206 through 217 of this Third Amended Complaint.

233.    Under New York common law, under which Plaintiff brings this Count VI, private nuisance "is actionable by the individual person or persons whose rights have been disturbed" when there is "an interference with the use or enjoyment of land". *Copart Industries, Inc. v. Consolidated Edison Co. of New York, Inc.*, 362 N.E.2d 968, 971 (N.Y. 1977).

234.    A defendant is liable "for a private nuisance if his conduct is a legal cause of the invasion of interest in the private use and enjoyment of land and such invasion is (1) intentional and unreasonable, (2) negligent or reckless, or (3) actionable under the rules governing liability for abnormally dangerous conditions or activities". *Id.*

235.    Plaintiff WPHA owns the WPHA's Property.

236.    BP Station Defendant Marianina's acts and omissions have interfered with Plaintiff's use and enjoyment of its Property.

237.    BP Station Defendant Marianina has acted intentionally and unreasonably and/or negligently and recklessly by failing to contain the sources of contamination and prevent the

migration of gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, onto the WPHA's Property.

238.    Plaintiff has suffered, and continues to suffer, damages from the private nuisance.

239.    Unless abated by order of this Court, the private nuisance will continue to cause Plaintiff irreparable injury.

240.    Unless abated by order of this Court, the private nuisance will cause irreparable injury to human health and the environment in, at, around and in the vicinity of the WPHA's Property.

241.    Unless abated by order of this Court, the private nuisance will likely prevent, restrict and/or make more complex HUD approvals and make more costly bank, developer, and other funding.

242.    Unless abated by order of this Court, the private nuisance has and will continue to force Plaintiff to incur costs responding to the contamination and potential risk.

### Count VII – Against Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus Trespass

243.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 100, 146 through 173, 193 through 205, and 218 through 231 of this Third Amended Complaint.

244.    To be liable, the trespasser "need not intend or expect the damaging consequence of his intrusion"; he need only "intend the act which amounts to or produces the unlawful invasion, and the intrusion must...be the immediate or inevitable consequence of what he willfully does, or which he does so negligently as to amount to willfulness." *Phillips v. Sun Oil Co.*, 121 N.E. 249, 250–51 (N.Y. 1954).

245.     Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus had good reason to know and did know that unless effectively controlled, the contamination on the former Getty Station property would migrate, and in fact had migrated, onto the WPHA's Property and Defendants intended the acts that failed to control the migration of the pollution onto the WPHA's Property.

246.     Under New York common law, when "polluting material has been deliberately put onto, or into, defendant's land" the defendant is liable for damage to his neighbor's land if the defendant "had good reason to know or expect that subterranean and other conditions were such that there would be passage from defendant's to plaintiff's land". *Id.* at 251.

247.     Tyree and Getty knew that the direction of groundwater flow from the former Getty Station property onto the WPHA's Property would and did result in the contamination of the WPHA's Property, and knew and had good reason to know that the deliberate termination in April 2007 of the operation of the dual phase high vacuum extraction system on the former Getty Station property would exacerbate and worsen the ongoing pollution of the WPHA's Property.

248.     Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus' acts and omissions have caused the invasion of gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, onto the WPHA's Property.

249.     Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus have allowed the invasion of gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, onto the WPHA's Property to continue for years without implementing remedial actions to effectively prevent the further migration of such contamination.

250.     The invasion of Getty Station Defendants Getty, Tyree, Michael C. Kenny, and

Kenneth C. Seus' gasoline and its breakdown products, including benzene and other solid wastes

and hazardous substances, onto the WPHA's Property will likely prevent, restrict and/or make

more complex HUD approvals and make more costly bank, developer, and other funding, and

has forced Plaintiff to incur costs responding to the contamination and potential risk.

251.     Unless abated by order of this Court, the trespass will continue to cause Plaintiff

irreparable injury.

252.     Unless abated by order of this Court, the trespass will cause irreparable injury to

human health and the environment in, at, around and in the vicinity of the WPHA's Property.

253.     Unless abated by order of this Court, the trespass has and will continue to force

Plaintiff to incur costs responding to the contamination and potential risk.

### Count VIII – Against the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer Negligence

254.     Plaintiff incorporates by reference the allegations contained in paragraphs 1

through 100, 146 through 173, 193 through 205, 218 through 231, and 243 through 253 of this

Third Amended Complaint.

255.     Under New York common law, under which Plaintiff brings this Count VIII, the

elements to establish negligence are: "1) a duty on the part of the defendant; 2) a breach of that

duty by conduct involving an unreasonable risk of harm; 3) damages suffered by the plaintiff;

and 4) causation, both in fact and proximate, between the breach and the plaintiff's harm."

*McCarthy v. Olin Corp.*, 119 F.3d 148, 161 (2d Cir. 1997) (internal quotation marks and

citations omitted).

256.     A landowner who engages in activities that may cause injury to persons on adjacent premises owes those persons a duty to take reasonable precautions to avoid injuring them. *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center Inc.*, 750 N.E.2d 1097, 1102 (N.Y. 2001).

257.     The Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer knew, or should have known, the dangerous, hazardous, and toxic nature of the chemicals released at and from the former Getty Station that the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer allowed to migrate onto the WPHA's Property.

258.     The Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer knew, or should have known, that the gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, were capable of causing serious property damage if released and allowed to migrate.

259.     The Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer owed a duty to Plaintiff, the adjacent property owner, to prevent the spill, release and migration of the gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances.

260.     The Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer owed a duty to Plaintiff to take all reasonable measures necessary to protect the public, including Plaintiff and its tenants, from the spill, release and migration of the gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances.

261.     The Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer acted negligently in causing the spill, release and continuing migration of the gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, by failing to take reasonable measures and precautions necessary to avoid and respond to the contamination and prevent the migration of contamination from the former Getty Station onto the WPHA's Property.

262.     The Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus' and Getty Station Defendant Singer's acts and omissions were the cause in fact and the proximate cause of the damages and injuries to Plaintiff.

263.     The Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer have allowed the invasion of gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, onto the WPHA's Property for years without implementing any effective remedial actions to prevent the further migration of such contamination.

264.     The Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus' and Getty Station Defendant Singer's failure to prevent the migration of contamination onto the WPHA's Property amounts to gross negligence.

265.     By reason of their negligence, the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer are liable for all of the damages and injuries to Plaintiff caused by the spill, release and migration of gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, onto the WPHA's Property.

## Count IX – Against BP Station Defendant Marianina
### Negligence

266.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 28, 101 through 145, 174 through 192, 206 through 217, and 232 through 242 of this Third Amended Complaint.

267.    Under New York common law, under which Plaintiff brings this Count IX, the elements to establish negligence are: "1) a duty on the part of the defendant; 2) a breach of that duty by conduct involving an unreasonable risk of harm; 3) damages suffered by the plaintiff; and 4) causation, both in fact and proximate, between the breach and the plaintiff's harm." *McCarthy v. Olin Corp.*, 119 F.3d 148, 161 (2d Cir. 1997) (internal quotation marks and citations omitted).

268.    A landowner who engages in activities that may cause injury to persons on adjacent premises owes those persons a duty to take reasonable precautions to avoid injuring them. *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center Inc.*, 750 N.E.2d 1097, 1102 (N.Y. 2001).

269.    BP Station Defendant Marianina knew, or should have known, the dangerous, hazardous, and toxic nature of the chemicals released at and from the BP Station that BP Station Defendant Marianina allowed to migrate onto the WPHA's Property.

270.    BP Station Defendant Marianina knew, or should have known, that the gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, were capable of causing serious property damage if released and allowed to migrate.

271.    BP Station Defendant Marianina owed a duty to Plaintiff, the adjacent property owner, to prevent the spill, release and migration of the gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances onto the WPHA's Property.

272.     BP Station Defendant Marianina owed a duty to Plaintiff to take all reasonable measures necessary to protect the public, including Plaintiff and its tenants, from the spill, release and migration of the gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances.

273.     BP Station Defendant Marianina acted negligently in causing the spill, release and continuing migration of the gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, by failing to take reasonable measures and precautions necessary to avoid and respond to the contamination and prevent the migration of contamination from the BP Station onto the WPHA's Property.

274.     BP Station Defendant Marianina's acts and omissions were the cause in fact and the proximate cause of the damages and injuries to Plaintiff.

275.     BP Station Defendant Marianina has allowed the invasion of gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, onto the WPHA's Property for years without implementing any effective remedial actions to prevent the further migration of such contamination.

276.     BP Station Defendant Marianina's failure to prevent the migration of contamination onto the WPHA's Property amounts to gross negligence.

277.     By reason of its negligence, BP Station Defendant Marianina is liable for all of the damages and injuries to Plaintiff caused by the spill, release and migration of gasoline and its breakdown products, including benzene and other solid wastes and hazardous substances, onto the WPHA's Property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court for judgment as follows:

## Count I

On Count I, with respect to the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus, Plaintiff asks this Court to:

      A.      Find that the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus are jointly and severally liable for taking all necessary action to investigate, abate and otherwise respond to potential endangerments associated with solid or hazardous wastes on the WPHA's Property that have migrated through groundwater from the former Getty Station onto the WPHA's Property.

      B.      Enter a mandatory injunction ordering the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus to pay jointly and severally the WPHA an amount of money determined at trial to be sufficient to fund the WPHA's development and implementation of a cost effective plan to: (1) eliminate all unacceptable risks to human health and the environment from the potential endangerment at or affecting the WPHA's Property; and (2) restore the WPHA's Property, as expeditiously as practicable, to the condition it was in prior to the contamination migrating from the former Getty Station; and

      C.      Order the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus to pay jointly and severally Plaintiff's costs of litigation, including, but not limited to, reasonable attorneys' fees and expert witness fees pursuant to 42 U.S.C. § 6972(e).

## Count II

On Count II, with respect to BP Station Defendant Marianina, Plaintiff asks this Court to:

      D.      Find that BP Station Defendant Marianina is liable for taking all necessary action to investigate, abate and otherwise respond to potential endangerments associated with solid or

hazardous wastes on the WPHA's Property that have migrated through groundwater from the BP Station onto the WPHA's Property.

      E.      Enter a mandatory injunction ordering BP Station Defendant Marianina to pay to the WPHA an amount of money determined at trial to be sufficient to fund the WPHA's development and implementation of a cost effective plan to: (1) eliminate all unacceptable risks to human health and the environment from the potential endangerment at or affecting the WPHA's Property; and (2) restore the WPHA's Property, as expeditiously as practicable, to the condition it was in prior to the contamination migrating from the BP Station; and

      F.      Order BP Station Defendant Marianina to pay Plaintiff's costs of litigation, including, but not limited to, reasonable attorneys' fees and expert witness fees pursuant to 42 U.S.C. § 6972(e).

## Count III

On Count III, with respect to the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer, Plaintiff asks this Court to:

      G.      Find, pursuant to § 181(5) of the New York State Navigation Law, that the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer are strictly liable for all costs of cleanup and removal and direct and indirect damages, including attorneys' fees, incurred by the WPHA as a result of the discharge and migration of the contamination from the former Getty Station onto WPHA's Property, plus interest; and

      H.      Require the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer to implement an appropriate plan to abate the discharge at or from the former Getty Station migrating onto the WPHA's Property, to

compensate the WPHA for abatement measures required on the WPHA's Property that the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer do not themselves implement, and to fully restore the WPHA's Property, as expeditiously as practicable, to the condition it was in prior to the contamination migrating from the former Getty Station, including without limitation by the safe and effective treatment of all contaminated groundwater on its property to fully achieve New York water quality standards, the excavation and removal of all soils contaminated by the discharge, and the restoration of all above ground facilities and appurtenances including the parking lot surface, walkways, shrubbery and other appurtenances impacted by the excavation of contaminated soils.

### Count IV

On Count IV, with respect to the BP Station Defendant Marianina, Plaintiff asks this Court to:

I.      Find, pursuant to § 181(5) of the New York State Navigation Law, that BP Station Defendant Marianina is strictly liable for all costs of cleanup and removal and direct and indirect damages, including attorneys' fees, incurred by the WPHA as a result of the discharge and migration of the contamination from the BP Station onto WPHA's Property, plus interest; and

J.      Require BP Station Defendant Marianina to implement an appropriate plan to abate the discharge at or from the BP Station migrating onto the WPHA's Property, to compensate the WPHA for abatement measures required on the WPHA's Property that BP Station Defendant Marianina does not itself implement, and to fully restore the WPHA's Property, as expeditiously as practicable, to the condition it was in prior to the contamination migrating from the BP Station, including without limitation by the safe and effective treatment of all contaminated groundwater on its property to fully achieve New York water quality standards, the excavation and removal of all soils contaminated by the discharge, and the restoration of all

above ground facilities and appurtenances including the parking lot surface, walkways, shrubbery and other appurtenances impacted by the excavation of contaminated soils.

### Count V

On Count V, with respect to the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer, Plaintiff asks this Court to:

K.      Find that the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer are jointly and severally liable (subject to a right of equitable apportionment among them) for taking all necessary action to investigate, abate and otherwise respond to the private nuisance arising from the former Getty Station and affecting the WPHA's Property;

L.      Award the WPHA damages or restitution as appropriate for the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus' and Getty Station Defendant Singer's failure to take all necessary actions to prevent, investigate, abate, and otherwise respond to the private nuisance arising from the former Getty Station and harming the WPHA's Property;

M.      Award the WPHA punitive damages for the egregious damage to the WPHA's Property caused by the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus' and Getty Station Defendant Singer's wanton and willful or reckless disregard for the WPHA's rights as the adjacent property owner; and

N.      Require the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer to implement an appropriate abatement plan for actual and threatened releases at or from the former Getty Station and migrating onto the WPHA's Property, to compensate the WPHA for abatement measures required on the WPHA's Property, and to restore the WPHA's Property, as expeditiously as practicable, to the condition it

was in prior to the contamination migrating from the former Getty Station including without limitation by the safe and effective treatment of all contaminated groundwater on its property to fully achieve New York water quality standards, the excavation and removal of all soils contaminated by the discharge, and the restoration of all above ground facilities and appurtenances including the parking lot surface, walkways, shrubbery and other appurtenances impacted by the excavation of contaminated soils.

## Count VI

On Count VI, with respect to BP Station Defendant Marianina, Plaintiff asks this Court to:

O.      Find that BP Station Defendant Marianina is liable for taking all necessary action to investigate, abate and otherwise respond to the private nuisance arising from the BP Station and affecting the WPHA's Property;

P.      Award the WPHA damages or restitution as appropriate for BP Station Defendant Marianina's failure to take all necessary actions to prevent, investigate, abate, and otherwise respond to the private nuisance arising from the BP Station and harming the WPHA's Property;

Q.      Award the WPHA punitive damages for the egregious damage to the WPHA's Property caused by BP Station Defendant Marianina's wanton and willful or reckless disregard for the WPHA's rights as the adjacent property owner; and

R.      Require BP Station Defendant Marianina to implement an appropriate abatement plan for actual and threatened releases at or from the BP Station and migrating onto the WPHA's Property, to compensate the WPHA for abatement measures required on the WPHA's Property, and to restore the WPHA's Property, as expeditiously as practicable, to the condition it was in prior to the contamination migrating from the BP Station including without limitation by the safe and effective treatment of all contaminated groundwater on its property to fully achieve New

York water quality standards, the excavation and removal of all soils contaminated by the discharge, and the restoration of all above ground facilities and appurtenances including the parking lot surface, walkways, shrubbery and other appurtenances impacted by the excavation of contaminated soils.

## Count VII

On Count VII, with respect to the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus, Plaintiff asks this Court to:

S.      Find that the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus are jointly and severally liable (subject to a right of equitable apportionment among them) for taking all necessary action to investigate, abate and otherwise respond to the trespass from the former Getty Station and affecting the WPHA's Property;

T.      Award the WPHA damages or restitution as appropriate for the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus' failure to take all necessary actions to prevent, investigate, abate, and otherwise respond to the trespass from the former Getty Station and affecting the WPHA's Property;

U.      Award the WPHA punitive damages for the egregious damage to the WPHA's Property caused by the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus' wanton and willful or reckless disregard for the WPHA's rights as the adjacent property owner; and

V.      Require the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus to implement an appropriate abatement plan for actual and threatened releases at or from the former Getty Station and migrating onto the WPHA's Property, to compensate the WPHA for abatement measures required on the WPHA's Property, and to restore the WPHA's

Property, as expeditiously as practicable, to the condition it was in prior to the contamination migrating from the former Getty Station including without limitation by the safe and effective treatment of all contaminated groundwater on its property to fully achieve New York water quality standards, the excavation and removal of all soils contaminated by the discharge, and the restoration of all above ground facilities and appurtenances including the parking lot surface, walkways, shrubbery and other appurtenances impacted by the excavation of the contaminated soils.

### Count VIII

On Count VIII, with respect to the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer, Plaintiff asks this Court to:

W.      Find that the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus and Getty Station Defendant Singer are jointly and severally liable (subject to a right of equitable apportionment among them) for the harm and damage to the WPHA's Property caused by the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus' and Getty Station Defendant Singer's breach of their duty to take reasonable actions to prevent, investigate, abate, and otherwise respond to the contamination migrating from the former Getty Station and affecting the WPHA's Property;

X.      Award the WPHA damages as appropriate for the harm and damage to the WPHA's Property caused by the WPHA's Property caused by the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and Kenneth C. Seus' and Getty Station Defendant Singer's breach of their duty to take reasonable actions to prevent, investigate, abate, and otherwise respond to the contamination migrating from the former Getty Station and affecting the WPHA's Property;

Y.      Award the WPHA punitive damages for the egregious damage to the WPHA's

Property caused by the WPHA's Property caused by the Getty Station Defendants Getty, Tyree,

Michael C. Kenny, and Kenneth C. Seus' and Getty Station Defendant Singer's wanton and

willful or reckless disregard for the WPHA's rights as the adjacent property owner; and

Z.      Require the Getty Station Defendants Getty, Tyree, Michael C. Kenny, and

Kenneth C. Seus and Getty Station Defendant Singer to implement an appropriate abatement

plan for actual and threatened releases at or from the former Getty Station and migrating onto the

WPHA's Property, to compensate the WPHA for abatement measures required on the WPHA's

Property, and to restore the WPHA's Property, as expeditiously as practicable, to the condition it

was in prior to the contamination migrating from the former Getty Station including without

limitation by the safe and effective treatment of all contaminated groundwater on its property to

fully achieve New York water quality standards, the excavation and removal of all soils

contaminated by the discharge, and the restoration of all above ground facilities and

appurtenances including the parking lot surface, walkways, shrubbery and other appurtenances

impacted by the excavation of the contaminated soils.

## Count IX

On Count IX, with respect to BP Station Defendant Marianina, Plaintiff asks this Court to:

AA.     Find that BP Station Defendant Marianina is liable for the harm and damage to

the WPHA's Property caused by BP Station Defendant Marianina's breach of its duty to take

reasonable actions to prevent, investigate, abate, and otherwise respond to the contamination

migrating from the BP Station and affecting the WPHA's Property;

BB.     Award the WPHA damages as appropriate for the harm and damage to the

WPHA's Property caused by BP Station Defendant Marianina's breach of its duty to take

reasonable actions to prevent, investigate, abate, and otherwise respond to the contamination migrating from the BP Station and affecting the WPHA's Property;

CC.     Award the WPHA punitive damages for the egregious damage to the WPHA's Property caused by BP Station Defendant Marianina's wanton and willful or reckless disregard for the WPHA's rights as the adjacent property owner; and

DD.     Require BP Station Defendant Marianina to implement an appropriate abatement plan for actual and threatened releases at or from the BP Station and migrating onto the WPHA's Property, to compensate the WPHA for abatement measures required on the WPHA's Property, and to restore the WPHA's Property, as expeditiously as practicable, to the condition it was in prior to the contamination migrating from the BP Station including without limitation by the safe and effective treatment of all contaminated groundwater on its property to fully achieve New York water quality standards, the excavation and removal of all soils contaminated by the discharge, and the restoration of all above ground facilities and appurtenances including the parking lot surface, walkways, shrubbery and other appurtenances impacted by the excavation of the contaminated soils.

### All Counts

On all counts, Plaintiff asks this Court to:

EE.     Retain continuing jurisdiction of this action to the extent necessary and for as long as necessary to enforce and interpret, and to review Defendants' compliance with, this Court's orders;

FF.     Award Plaintiff's attorneys' fees and costs consistent with applicable law; and

GG.     Grant Plaintiff such other and further relief as the Court deems just and proper.

## <u>REQUEST FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff respectfully requests that this

matter be tried by jury.

DATED this 14th day of August, 2015.

Respectfully submitted,

Norman W. Bernstein, Attorney No. NB5123
Inga Caldwell, Attorney No. IC1109
N.W. Bernstein & Associates, LLC
800 Westchester Avenue, Suite N319
Rye Brook, New York 10573
Telephone Number: (914) 358-3500
Facsimile Number: (914) 701-0707

Attorneys for Plaintiff



FORMER GETTY STATION
26 EAST POST ROAD

WHITE PLAINS, WESTCHESTER NEW YORK

BENZENE CONCENTRATION ISOPLETH
07/13/2011

LEGEND

MW-102  MONITORING WELL LOCATION
MW-102  ABANDONED MONITORING WELL LOCATION
GP-14   GROUNDWATER GAUGING POINT
280     BENZENE CONCENTRATION IN GROUNDWATER
        IN ug/L
300     BENZENE CONCENTRATION ISOPLETH
NS      NOT SAMPLED
ND      NOT DETECTED
        INFERRED GROUNDWATER &
        PLUME MIGRATION DIRECTION

FIGURE 1

FIRST ENVIRONMENT

BOONTON                    NEW JERSEY

